SMITH F. BRANDON, APPELLANT, v. KANSAS CITY STOCK YARDS COMPANY ET AL., GARNISHEE, SCOTT KENNEDY ET AL., INTERPLEADER, RESPONDENT.

Kansas City Court of Appeals. January 27, 1930.

*Howard L. Jamison* and *Smith F. Brandom* for appellant.

*Farris & Phillips* for respondent.

BLAND, J.—On April 7, 1927, plaintiff Brandom, commenced by attachment this action against defendant, W. H. Power, in the circuit court of Jackson county, Missouri. The petition was based upon a promissory note executed by defendant in favor of Crider Bros. Commission Company, as payee, who endorsed the note to plaintiff. This note was dated December 15, 1925, and was in the sum of $1073.17. It was payable four months after date. On April 8, 1927, the Kansas City Stock Yards Company and the Chicago, Burlington & Quincy Railroad Company were served with the writ of attachment and summoned as garnishees. On May 11, 1927, the Railroad Company filed a separate answer stating that at the time of the service of the writ it was in possession of fifty-seven head of live stock consigned by the Kennedy-Bone Calf Company in Kansas City, Missouri, to defendant at Humboldt, Nebraska. Later, upon motion of the Railroad Company, the Kennedy-Bone Calf Company was ordered to interplead to the case. Thereafter the Kennedy-Bone Calf Company filed its interplea claiming to be the owner of the live stock in question. To this interplea plaintiff filed an answer alleging that the stock was the property of defendant at the time of the service of the writ of attachment.

On April 11, Scott Kennedy and Orland S. Bone, as partners doing business under the name and style of Kennedy-Bone Calf Company, filed a suit in replevin against the Kansas City Stock Yards Company and the Chicago, Burlington & Quincy Railroad Company, and under the writ the stock in question was taken out of the possession of the defendant, Kansas City Stock Yards Company, and delivered to the plaintiff. By an agreement of the parties the two cases were consolidated, a jury was waived and the two cases were tried at the same time upon the same evidence. At the conclusion of the trial the court rendered separate judgments, one in the attachment suit in favor of the interpleaders and the other in

the replevin suit in favor of the plaintiff therein. Plaintiff in the attachment suit has appealed but there does not appear to have been any appeal taken from the judgment in the replevin case. No question has been presented here, except as to the title of the stock at the time of the service of the writ of attachment. All other points raised by plaintiff appear to be conceded by interpleaders.

The facts show that one W. H. Power of Humboldt, Nebraska, on April 7, 1927, purchased at the Kansas City Stock Yards in Kansas City, Missouri, fifty-seven head of calves from the Kennedy-Bone Calf Company, a co-partnership of Kansas City, Missouri, at the price and sum of $1847.54. Under the terms of the purchase the sale was for cash. Power delivered to the Calf Company his check in the sum of $1867.54. This sum covered the purchase price of the calves plus $20 cash which at the time was advanced to him by the Calf Company. Power directed the Calf Company to ship the calves to him at Humboldt, Nebraska, but did not designate the railroad over which the shipment should be made. The check was drawn on the Nebraska State Bank of Humboldt, with which Power did business.

Scott Kennedy, one of the interpleaders, testified that he did not consider the check when he received it from Power as payment until it should be honored. So on April 7, 1927, he wired the Nebraska State Bank at Humboldt, Nebraska, as follows:

"Will you honor W. H. Power check for Eighteen Hundred Sixty Seven Dollars and fifty-four cents covering fifty-seven calves. Please answer. Kennedy-Bone Calf Co."

To this wire the bank on April 8, 1927, answered by telegraph as follows:

"Your wire seventh will pay W. H. Power check."

The calves were not shipped until the Calf Company received this wire from the bank.

The facts further show that on the afternoon of April 7, one Rea of the Crider Commission Company told interpleader, Bone, that he had "a little inkling" that the calves would be attached if they were delivered by the interpleaders to the railroad company for shipment to Power, and that he was anxious to know whether Bone had received any answer to the wire that had been sent to the bank. Bone told Rea that the interpleaders would not ship the calves until they received a wire from the bank "saying they would pay the check." The next day, or on April 8, Bone told Rea that he had received an answer to the message.

The facts further show that upon receipt of the telegram from the bank, stating it would pay the check, interpleaders ordered the Stock Yards Company to deliver the calves to the Chicago, Burlington & Quincy Railroad Company for shipment to Power at Humboldt. Kennedy testified that, as he did not consider the Power check pay-

ment until it was honored, he relied upon the wire from the bank honoring the check in shipping the cattle and that they would not have been shipped unless the wire had been received. After the Calf Company ordered the Stock Yards Company to turn over the calves to the Railroad Company and after the last-mentioned company was served with the writ of attachment the Railroad Company notified Kennedy of the service of the writ. Thereupon Kennedy called up the bank and asked "if Power had this money in the bank." The agent of the bank talking for it said, "no, that he had made some arrangements to take care of it when the check arrived, and I told them that the cattle were still in the yards, and they had been attached, and then he said, 'well, in that case we will not pay the check.' " Kennedy further testified that he thought it strange that the bank would certify the check if Power did not have the money there to pay it and that the witness was taking the check on the condition that the check "was good." Kennedy further testified that the reason he called the bank after the calves had been attached was that he didn't consider the check as payment of the cattle and wanted to know if the check would be paid.

The facts further show that after the telephone conversation, and on April 9, 1927, the bank sent the following wire to the interpleaders:

"Will not honor check for fifty seven calves for W. H. Power."

However, the check was deposited by the interpleaders in their bank in Kansas City and after going through the usual course it was returned protested for non-payment.

The cattle were shipped by the interpleaders under a straight bill of lading to Power as consignee, destination Humboldt, Nebraska, freight to be paid by the consignee.

The evidence shows that Power did not have the money in the bank with which to meet his check but there was a custom followed between Power and the bank in reference to the payment of checks given for live stock which he purchased. It appears that Power was a dealer in live stock and that the practise was for Power to give his check to the seller for the purchase price of the live stock; that the stock would be shipped to him and would arrive before the check and upon the arrival of the former he would give a chattel mortgage on them to the bank for the purchase price of the stock, the bank giving him credit on his account for the amount of the mortgage, and upon the arrival of the check it would debit Power's account with the amount thereof. In this way he was enabled to pay for the stock. Of course, in this instance the live stock never arrived at Humboldt and the usual procedure was not followed.

At the conclusion of all of the testimony the plaintiff requested the court to make findings of facts and conclusions of law. The court refused to give the conclusions of law, amended the findings

of fact requested and gave them as so amended and his own conclusions of law. From the findings of fact and the conclusions made by the court it would appear that the court decided this case for the interpleaders on the theory that as the purchase price of the calves was to be paid in cash and as Power had no funds in the bank with which to meet his check and as the bank finally refused to pay the check, the calves were not paid for; that Power did not designate the road over which the calves were to be shipped and therefore the railroad was the agent of the sellers, that this, together with the fact that the consignee was to pay the freight, shows the title did not pass to Power and could not have passed until the freight was paid by him and the calves delivered to him at Humboldt, Nebraska. It therefore, appears that it was the opinion of the court that there could have been no waiver of payment short of the delivery of the calves under said circumstances.

Plaintiff complains of the refusal of his findings and conclusions and of the court's findings and conclusions. We think that it is quite apparent that the trial court decided this case upon the wrong theory. In the first place there is no question but that the certification of the check constituted payment, and even if that were not true, the fact that the sellers selected the railroad for the transportation of the calves really has little or no bearing upon the controversy. However, the manner in which the stock was shipped does have considerable bearing upon the question of waiver of payment of the purchase price. The fact that the seller shipped the calves under a straight bill of lading and not under a shipper's bill, and provided that Power, the consignee and buyer, pay the freight, ordinarily would constitute delivery and the vesting of title in the buyer when the calves were shipped and is strong evidence of an intention of the sellers to waive the question of payment in cash, it being admitted that the taking of Power's check without certification did not constitute payment. The fact that Power left to the Calf Company the selection of the railroad did not make it the agent of the Calf Company but if there were no other but the above circumstances it would be the agent of Power. [Scharff v. Meyer, 133 Mo. 428; Street v. Werthan, 200 S. W. 739, 743; T. J. Moss Tie Co. v. Stamp, 7 S. W. (2d) 407; Milling Co. v. Stanley, 132 Mo. App. 398; Turner Looker Co. v. Hindman, 298 Mo. 61, 66, 67; Carder v. Ry., 170 Mo. App. 698, 704, 705; Roaring Fork Potato Growers v. Produce Co., 193 Mo. App. 653, 657; 24 R. C. L. 40; 35 Cyc., 322, 323, 325 327, 328, 329.] And these circumstances would be conclusive evidence of the waiver of payment in cash if it were not for the fact that the Calf Company indicated that it did not waive that provision of the contract by refusing to ship the calves until the check was certified.

However, the question of waiver is really not an important one in this case for the reason that there is no doubt but that when the check was certified it constituted, not only payment of the check, but payment for the calves by Power to Calf Company. [Secs. 973, 974, R. S. 1919; Krikorian v. Fermanian, 196 N. Y. S. 629.] In the case of City of Brunswick v. Peoples Savs. Bk., 194 Mo. App. 360, 361, 362, this court said:

"When a bank at the request of the drawer of a check certifies it before delivery to the payee and it is then delivered, the certification does not discharge the drawer if the check is not paid on due presentment. The certification simply vouches for the genuineness of the check, and that it will be paid on presentment; and merely adds to its easy negotiation by adding the promise of the bank. [Born v. Bank, 123 Ind. 78; Oyster & Fish Co. v. Bank, 51 Ohio St. 106; Minott v. Russ, 156 Mass. 458; 128 Am. St. Rep. 691 and 696.]

"But if the *holder* receive an uncertified check, and instead of drawing the money *has it certified, he discharges the drawer, for he has accepted the bank as his sole debtor, the same as if he had drawn the money then deposited it and taken a certificate of deposit for it.*" (Italics ours.)

The court also cites what is now section 974, Revised Statutes 1919. [See, also, Muth v. St. Louis Trust Co., 88 Mo. App. 596, 603, 604; Bank of Springfield v. The First Nat'l Bk. of Springfield, 30 Mo. App. 271, 275; National Mechanics Bank v. Schmelz Nat'l Bk., 136 Va. 33; Carnegie Trust Co. v. First Nat'l Bk. of the City of N. Y., 213 N. Y. 301.]

It is held in Krikorian v. Fermanian, supra, that the party who has a check certified accepts the bank as his debtor, and not only releases the drawer from liability upon the check but elects to take the check as payment of the drawer's debt.

There is no contention made that the first two telegrams exchanged were not sufficient to constitute a certification of the check but as they sufficiently identified the check there is no question but that they were sufficient to constitute certification. [7 C. J., 705; Ensign v. Clark Bros., 195 Mo. App. 584; State Bank v. Citizens Nat'l Bk., 114 Mo. App. 663.]

We have no quarrel with the authorities cited by the interpleaders to the effect that a check is not payment unless it is taken as such or where such a check is dishonored the title to the property for which it is given does not pass where the terms of the contract required payment in cash, unless, of course, the matter of payment in cash is waived. In this case the check was not dishonored but certified and under all of the authorities this certification was equivalent to payment of the same as though the Calf Company had withdrawn the money from the bank and deposited at therein in its

own name. As we construe the contention of the interpleaders they admit that the certification of the check by the bank released Power on the Calf Company accepted the bank as its debtor, but it is claimed that this procedure on the part of the Calf Company did not waive the matter of payment by Power, unless he or some one for him actually made payment. It is true that the terms of the sale were cash but if the procuring by the Calf Company of the check to be certified was not equivalent to the receipt by it of cash it nevertheless was payment as payment in cash was thus waived. The Calf Company treated the certified check as payment. This is shown by the fact that it refused to ship the calves until the check was honored by certification and did ship them when it was thus honored. According to the authorities which we have cited this transaction constituted a payment of the indebtedness from Power to the Calf Company, and this being the situation, title passed and there was nothing to prevent the obtaining of a lien by the levy by a creditor of Power of an attachment upon the calves. And this is true although there was conduct on the part of the bank and the Calf Company, after the attachment was served, which might possibly be construed as a mutual revocation of the certification of the check. However, we are not passing upon the legal effect of this conduct except to say that it could not affect the lien, if any, thus acquired by the plaintiff. [6 C. J., 286, 292, 293.]

It seems to be contended by the interpleaders that because Power had no money in the bank with which to pay for the calves that he had no interest in them and could not have had the title at the time the attachment was run and that the most that can be said is that he was in the act of purchasing the calves but had no interest in them. We are not concerned with the relationship existing between Power and the Bank as between themselves. If the bank saw fit to certify the check without Power having the money in the bank that was the bank's business, but the bank could not assert any such circumstance as against the Calf Company. [Robinett v. Bank, 178 Mo. App. 422.] The Calf Company had no knowledge or notice of the fact that Power did not have the funds in the bank with which to meet the check at the time it was given or certified. [National City Bk. v. Titlow, 233 Fed. 838; National Bk. v. National Bk., supra.] There is no question but that at the time the writ of attachment was served the Calf Company had a perfect cause of action against the bank upon the check, that the calves were paid for and that title to them had passed to Power.

The judgment is reversed and the cause remanded. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.