254 S.W.2d 275 (1953)
BROWN et al.
v.
CHILDERS.
No. 21799.
Kansas City Court of Appeals. Missouri.
January 12, 1953.
*276 Walter A. Raymond, Kansas City, M. Fairlee Tegarden, Independence, for appellant.
Harvey Roney, Kansas City, Virgil A. Julian, Independence, for respondents.
BOUR, Commissioner.
This is an appeal by defendant, A. Layle "Petey" Childers, from a decree in favor of plaintiffs, Frank R. Brown, Jr., and Damon A. Bogart, in an action to enforce by injunction a negative covenant in a contract of sale, by which defendant agreed not to engage in the retail drug and prescription business for a stated period and within a certain area. Since this is a suit in equity, we will review the case upon the law and the evidence and reach our own conclusion, giving due regard to the opportunity of the chancellor to judge of the credibility of the witnesses.
The defendant, his brother William H. Childers, and Ralph S. Thomas are registered pharmacists. From 1933 to 1944 or 1945, defendant and his brother owned and operated a retail drug store known as the Childers Prescription Shop and located in the First National Bank Building in Independence, Missouri. In 1944 or 1945, Ralph S. Thomas became a member of the partnership and the three partners operated the shop until May 11, 1950. On April 29, 1950, the defendant and his two partners entered into a written contract with plaintiff Frank R. Brown, Jr., wherein they agreed to sell and convey to Brown "on May 11, 1950, all their right, title and interest in and to the Childers Prescription Shop, the same to include all merchandise and stock, furniture and fixtures, equipment, stationery, supplies, and good will," together with three delivery cars and certain accounts receivable, for the sum of $100,000, to be paid as follows: $10,000 on the signing of the contract, the receipt of which was acknowledged by the sellers; $50,000 on May 11, 1950, and the balance of $40,000 "to be represented by a note signed by the buyer and secured by a chattel mortgage covering the property conveyed, said note to bear interest at the rate of five per cent and payable One Thousand Dollars ($1,000.00) monthly, principal and interest; * * * with privilege of prepayment at any time." The contract provided that "the buyer may continue to use the name of Childers Prescription Shop."
The contract also contained the following provision: "For and in consideration of Thirty Thousand Dollars ($30,000.00) of the purchase price, the sellers hereby warrant to the buyer that they will not within five years from this date re-enter the retail drug or prescription business in the City of Independence, Missouri, or in Jackson County, outside of Kansas City, Missouri, nor are they to be employed in such business with any other firm, in the above described territory, other than the Childers Prescription Shop, so long as owned by Frank R. Brown, Jr., in part or whole, and it is understood that they will accept employment of the buyer on terms to be agreed upon, from time to time; and that William H. Childers and Ralph S. Thomas will continue in such employment for a reasonable time." The other provisions of the contract are not material here.
Defendant testified as follows:
"Q. What was the consideration paid to you and your partners for the sale of this Childers Prescription *277 Shop? A. One Hundred Thousand Dollars. * * *
"Q. Isn't it true that the physical assets were perhaps around $30,000.00 altogether and that $40,000.00 was paid for the established business and good will and $30,000.00 for a covenant not to re-enter the business? A. That is it, I think. * * *
"Q. At the time you sold the Childers Prescription Shop did you have a lease on the building where it is operated? A. No, sir.
"Q. Just renting from month to month? A. Yes, sir."
While Damon A. Bogart is one of the plaintiffs in this case, his name does not appear in the written contract referred to above, and he did not sign that contract. Bogart did not testify at the trial and the testimony in the record does not show when he acquired an interest in the prescription shop. It would seem, however, that he acquired an interest in the business at the time of the sale. The petition alleges that "on the 29th day of April, 1950, the plaintiffs purchased the Childers Prescription Shop" from defendant and his partners and "that plaintiffs paid to the parties aforesaid" the sum of $100,000, "for the Childers Prescription Shop, together with established business, good will and a covenant and agreement from the Sellers aforesaid that the Sellers would not re-enter the retail drug or prescription business in the City of Independence or in Jackson County, Missouri, outside of Kansas City for a period of five years from the date of the sale." (Italics ours.) These averments were admitted by defendant in his answer.
For the sake of brevity, that part of Jackson County outside of Kansas City, including Independence, will sometimes be designated as the "prohibited" territory or area.
Plaintiffs took charge of the prescription shop on or about May 11, 1950, and they were operating the shop at the time of the trial. As we understand the evidence, plaintiff Brown was the manager of the business. On June 18, 1951, defendant opened a retail drug store, known as the Professional Pharmacy, at 8516 Winner Road, Kansas City, Missouri. This pharmacy is located about a block and a half from the eastern limits of Kansas City and five or six miles from the Childers Prescription Shop in Independence. Defendant sent telegrams to fifteen or twenty doctors residing in the prohibited territory, the telegrams reading as follows: "Announcing opening of the Professional Pharmacy 8516 Winner Road June 18th. Telephone Independence 4340Petey Childers." Defendant testified that he paid $39 a month for the "Independence telephone" and that he had it installed so that persons living in Independence and eastern Jackson County could call his store in Kansas City without paying the usual charge for such service. He also circulated business cards which carried his name, the address of the Professional Pharmacy, and the following: "Have your Physician call Indep. 4340 for Prescriptions. Free Delivery."
The evidence further shows that defendant advertised his Kansas City store in the Jackson County Democrat, the Independence Examiner, the Daily News, the Inter-City News, and the Pictorial Shopper, all of which were published and circulated in the prohibited territory. These full-page advertisements carried pictures of the interior and exterior of the Professional Pharmacy, gave the location of the store, and contained the following statements: "Operated by `Petey' Childers""Have your Physician call IN. 4340 for Prescriptions""Free Delivery in all of Independence, E. Independence, Golden Acres, Beverly Hills, Sugar Creek, and all of the Inter-City District," all such places being within the prohibited area. Two of the advertisements carried this statement: "We Call For and Deliver your Prescriptions"; and one read: "Prescriptions Delivered or Mailed Free Anywhere." Lettering on defendant's delivery car advertised the free delivery service. Defendant admitted that he accepted orders from persons living within the prohibited area and made deliveries within such area until a temporary injunction was granted in this case. Other evidence will be stated in the course of the opinion.
*278 This suit was instituted on June 20, 1951, and a temporary injunction was granted on July 6, 1951. A trial was had on the merits of the case on January 20, 1952, resulting in a decree enjoining "the defendant, A. Layle `Petey' Childers, his agents, servants or employees from soliciting or accepting orders or delivering orders of retail drugs or prescriptions in Independence, Missouri, or in Jackson County, Missouri, outside of Kansas City, Missouri, for a period of five years from the 29th day of April, 1950, or until some further order be made by the court in the premises."
Defendant-appellant does not question the validity of the restrictive covenant in the contract of sale; nor does he deny that he re-entered the drug and prescription business in competition with plaintiffs. Instead, he seeks to justify his action, and relies upon the pleaded defense that "supplementary to the written contract of sale * * * and as a part of the consideration for said sale and transfer of said business the plaintiff, Frank R. Brown, Jr., orally agreed to employ defendant as a pharmacist in said drug store"; that plaintiffs have "refused to employ defendant in said drug store in accordance with said oral agreement and understanding; that defendant was at all times ready, able and desirous of having such employment; * * * that because of their breach of their agreement as aforesaid plaintiffs do not come into this court of equity with clean hands nor are they willing to do equity by furnishing defendant the employment agreed upon and are therefore not entitled to relief in a court of equity."
It will be noticed that defendant alleged in his answer that "plaintiff, Frank R. Brown, Jr., orally agreed to employ defendant as a pharmacist in said drug store," and then charges that the "plaintiffs" breached "their agreement as aforesaid." The evidence shows that defendant and his partners dealt with Brown throughout the negotiations which culminated in the sale of the Childers Prescription Shop; but as pointed out above, the petition alleged and defendant admitted that "plaintiffs" purchased the prescription shop from defendant and his partners, and that "plaintiffs" paid the sellers $100,000 for said shop. It would seem, therefore, that Brown acted for plaintiff Bogart, as well as for himself, in his dealings with the sellers. In fact, the name of "Frank R. Brown, Jr.," and the word "plaintiffs" are used interchangeably in the briefs.
As we have seen, the contract of sale contained the following provision: "* * * and it is understood that they (the three sellers) will accept employment of the buyer on terms to be agreed upon, from time to time; and that William H. Childers and Ralph S. Thomas will continue in such employment for a reasonable time." Following the sale defendant's brother William worked for plaintiffs on a part-time basis and Thomas accepted full-time employment with plaintiffs. After they had worked in the prescription shop about six weeks or two months their employment was terminated by plaintiffs. On April 30, 1950, the day after the contract was executed, defendant went to Colorado for a vacation. He returned to Independence about September 1, 1950, but plaintiffs did not employ him. As stated, he opened the Professional Pharmacy in Kansas City on June 18, 1951.
The record shows that plaintiffs called defendant as their first witness. Concerning the alleged "supplementary" oral agreement, defendant testified on cross-examination that during the negotiations leading up to the execution of the contract of sale, he and his partners discussed with plaintiff Brown the matter of their employment in the prescription shop after the sale was completed; and continued:
"Q. Tell His Honor what your understanding was about the employment. A. I was to be employed when I returned from Colorado. I had a misfortune in my family and I needed a rest and I was going to Colorado to rest for the summer * * *.
"Q. Were you employed by Frank Brown, Junior when you came back? A. No, sir; he sent word to me that I was discharged. * * *
"Q. All of you were to be employed, as part of the agreement? A. Yes, sir. * * * I was to be away *279 for the summer vacation and rest, and I was to come back and go to work in the fall. * * *
"Q. When you came back in the fall were you ready, willing, and able to go to work for him? A. Yes, sir."
Defendant testified on re-direct examination:
"Q. You had at least two discussions before you went up to Byron Stewart's office to close this deal? A. Yes, sir.
"Q. Byron Stewart was there representing you as your lawyer? A. Yes, sir. * * * I told him (Stewart) we had talked about it and that I was to be employed by Frank Brown, Junior.
"Q. For how long? A. There was no specified time.
"Q. At what salary? A. There was no specified salary. * * *
"Q. Frank (Brown) in the course of this discussion asked you if you would stay for a reasonable time? That is, your two partners? A. Yes, sir.
"Q. Mr. Stewart incorporated that into the contract that they would stay a reasonable time at Mr. Brown's request? A. Yes, sir. * * *
"Q. If I understand your testimony correctly now you had these two conferences at which there was no agreement reached as to the amount of time you were to be employed or the salary you were to receive? A. He wanted us to stay with him to be sure he could hold the business.
"Q. Armed with that knowledge you went to your own lawyer and did not ask him to incorporate any such thing in the contract of sale? A. That's right; it was a gentlemen's agreement."
As indicated above, Byron A. Stewart prepared the contract of sale for the sellers. He did not participate in the trial of this case, but was called as a witness for defendant. He testified that he was present on two occasions when Brown and the sellers were discussing terms of the sale; that Brown said he was not familiar with the operation of the business and asked defendant's brother and Thomas to stay with him a reasonable length of time; that as he understood the discussions all of the sellers were to be employed, but "there was no definite time to start, or definite time of employment"; and continued:
"Q. It was more or less in the nature of an informal discussion and Frank Brown was there asking them for some help to go on and get the business started? A. That's right. * * *
"Q. Therefore you put in the contract, `that it is understood that they will accept employment of the buyer on terms to be agreed upon, from time to time; and that William H. Childers and Ralph S. Thomas will continue in such employment for a reasonable time'? A. That is right.
"Q. There was no time set? A. No.
"The Court: I understand that was not discussed, no definite term?
"The Witness: No definite term or definite compensation at any time.
"The Court: That applies to all these three?
"The Witness: That is right.
"Q. Except the sellers would continue to help the buyer there if he needed them? A. Yes, sir; that is correct."
William H. Childers and Thomas were called as witnesses for defendant. Defendant's brother testified that before the contract of sale was executed he orally "agreed" to work for Brown "not more than thirty-five or forty hours a week"; that Brown said "he wanted Ralph (Thomas) to work full time"; that "Petey was to come back to work in September"; and continued:
"A. The only definite salary we agreed on was that he would pay me two dollars an hour. So far as any specific length of time, I can't say that he put any definite date down * * *. He asked me how long I could stay and I told him if it was satisfactory I would stay a year or three years or ten years.

*280 "Q. Did Mr. Brown agree at any time to employ any of you three partners for any definite period of time? A. No, sir.
"Q. Or at any definite weekly or monthly salary, except the hourly rate that you mentioned? A. No, he never said how much * * *."
The testimony of Thomas was substantially the same as that of defendant's brother.
Plaintiff Brown testified that at no time did he agree to "employ any of these partners for any definite time"; and continued: "They agreed to help mein consideration of the amount of money I was paying, they agreed to stay for a reasonable length of time to help me get over the period of transition of ownership, but because Pete had had a death in his immediate family and because he didn't know exactly what he really wanted to do at that particular time we couldn't come to any definite agreement with Pete as to employment at the changeover period. I had naturally put everything I had up on the line in the purchase price of this shop, and W. H. Childers and Ralph Thomas would accept employment. Pete I think was willing but unable at that time. They agreed to help me in the transition period of the business. Q. If I understand you correctly, there was no formal agreement made between you and any of these partners who had operated the business and were selling it to you, to employ them for any definite or fixed time? A. That's right. Q. They were simply agreeing to help you get over the load of the change of ownership? A. That is correct." Brown testified on cross-examination that at the time of the sale defendant said he would "be available for employment" when he returned to Independence in the fall; that he told defendant he would see him in the fall because he thought he would need his services. Brown further testified that defendant's brother and Thomas were discharged after they had worked for plaintiffs about six weeks or two months "because we thought the transition period was over," and that shortly thereafter he employed two other pharmacists.
After hearing the evidence the chancellor found that plaintiffs were under no duty or obligation to employ defendant; hence the fact that he was not so employed did not preclude plaintiffs from obtaining injunctive relief in this case. We agree. It is elementary that there can be no contract without mutual assent of the parties thereto; and such assent must be manifested by one party to the other. Longmire v. Diagraph-Bradley Stencil Mach. Corp., Mo.App., 176 S.W.2d 635; Embry v. Hargadine, McKittrick Dry Goods Co., 127 Mo.App. 383, 105 S.W. 777. There must be a definite offer and an unequivocal acceptance. Cottonseed Delinting Corp. v. Roberts Brothers, Mo.Sup., 218 S.W.2d 592, 594. "An offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain." Restatement, Contracts, Vol. 1, sec. 32. In other words, "an agreement in order to be binding must be sufficiently definite to enable a court to give it an exact meaning." Williston on Contracts, Vol. 1, sec. 37, p. 98. See also Voorhees v. Louisiana Purchase Exposition Co., 243 Mo. 418, 147 S.W. 783; Bay v. Bedwell, Mo.App., 21 S.W.2d 203; Hubbard v. Turner Dept. Store, 220 Mo.App. 95, 278 S.W. 1060; 12 Am.Jur., Contracts, sec. 64, p. 554; 17 C.J.S., Contracts, § 36, p. 364.
In the instant case defendant testified that it was his "understanding" that he "was to be employed" when he returned to Independence, and that his two partners "were to be employed" for "a reasonable time." But as stated in Longmire v. Diagraph-Bradley Stencil Mach. Corp., supra: "It has long been the law that the question of whether a contract is made or not depends, not on what one of the parties understood * * *, but upon what was actually said and done." 176 S.W.2d loc. cit. 646. When defendant was pressed by counsel for plaintiff, he said that Brown "wanted us to stay with him to be sure he could hold the business," but admitted that there was no agreement that he would be employed for any definite period of time or at any specified salary. As indicated, the testimony *281 of defendant's former partners was to the same effect. Testimony of plaintiff Brown and Byron A. Stewart was to the effect that Brown asked defendant's brother and Thomas to stay with him a reasonable length of time; and that the matter of defendant's employment was discussed, but there was no definite agreement as to the terms of his employment. There can be no contract so long as the essential terms thereof are reserved for the future determination of both parties. Dobbins v. City Bond & Mortgage Co., 243 Mo. 1001, 124 S.W.2d 1111; Jesse v. Rolaff, Mo.App., 74 S.W.2d 890; Williston on Contracts, Vol. 1, sec. 45, p. 131; Am.Jur., Contracts, sec. 23.
We think the testimony of defendant, as well as that of the other witnesses, shows that Brown and defendant never entered into a binding oral contract of employment. Furthermore, the written contract of sale recited that "it is understood that they (the sellers) will accept employment of the buyer on terms to be agreed upon, from time to time." This is further proof that Brown and defendant had not reached a definite agreement as to the latter's employment when they executed the contract of sale. There is no contention that any such contract was subsequently made. The issue under discussion was tried over the objection of plaintiffs, but we need not say whether it was properly tried, because the finding was in favor of plaintiffs. Since the evidence clearly supports the finding, we hold that plaintiffs did not come into court with "unclean hands."
We have examined the numerous cases cited by defendant and find nothing in the opinions inconsistent with the conclusion which we have reached. The facts in the cases cited are unlike those in the case at bar.
Defendant further contends that even if plaintiffs are entitled to injunctive relief the decree is too broad in that it enjoins defendant from making deliveries within the prohibited area "by a common carrier such as the express company or by parcel post." The same contention was made in the trial court, but the chancellor refused to modify the decree. In support of this contention defendant argues that "any sale of defendant at his store in Kansas City to be delivered by a common carrier * * * would be a sale completed in Kansas City and not a violation of the restrictive covenant" in the contract of sale; and he insists "that under the Missouri law defendant had the right to accept orders to be filled by shipping C. O. D. by express, parcel post or any other common carrier as that would be business done in Kansas City and not in the forbidden territory."
Defendant relies upon State v. Koontz, 275 Mo. 475, 204 S.W. 1086; State v. Rosenberger, 212 Mo. 648, 111 S.W. 509, 20 L.R.A.,N.S., 284; State v. Scott, Mo.App., 189 S.W. 1191. In these cases it appeared that intoxicating liquor was shipped by common carrier, from a county in the state where it was lawful to sell it, to a purchaser in a local option county; and it was held that there was no violation of the local option law because the sale took place at the point of shipment, irrespective of where the order was accepted, and that the carrier was the agent of the purchaser and not of the seller. This was held to be the case even where the liquor was consigned C. O. D. In the Rosenberger case the court said, 111 S.W. loc. cit. 511: "There is no question that Morton ordered the liquor in question for his own use, C. O. D., and, when it was so shipped, the sale became complete at the place of shipment." Defendant also relies upon Brandom v. Power, 224 Mo.App. 858, 27 S.W.2d 65, where it was held that the title to calves vested in the purchaser on delivery to a carrier for transportation, notwithstanding the selection of the carrier was left to the seller.
It is obvious that the cases cited by defendant are not in point. The question presented for our determination cannot be resolved by reference to local option laws or to any rule or principle of the law of sales. It must be determined, of course, by reference to the restrictive covenant in the contract of sale and the circumstances of the case. 36 Am.Jur., Monopolies, etc., sec. 72, p. 549. The contract of sale provided that in consideration of $30,000 of the purchase price "the sellers hereby warrant to the buyer that they will not within five years *282 from this date re-enter the retail drug or prescription business" within a designated territory. As stated, defendant testified that the physical assets of the business were valued at $30,000; that the sellers received $40,000 for the good will of the business; and $30,000 for the covenant just quoted.
In Hessel v. Hill, Mo.App., 38 S.W.2d 490, 491, 492, it appeared that the defendant sold to the plaintiff his undertaking business at Liberty, Missouri, under a contract whereby he agreed "`not re-enter the undertaking business in Liberty, Mo., or within a radius of ten miles, of said city, for a period of ten years'". A month later, he opened an office in North Kansas City, more than ten miles from Liberty, but continued to live in Liberty. He advertised his business in the Liberty telephone directory, listed therein his residence and office telephone numbers, and on two occasions rendered customary burial services in Liberty. In holding that it was proper to enjoin defendant from carrying on such business within the prohibited territory, this court said that it was the evident purpose of the restrictive clause to protect the purchaser from competition in the business which he was buying; that it would be "unjust to hold that defendant in this case may camp upon the border of the restricted territory, in a room designated as an office, and continue to hold and enjoy the benefit of that which he had sold, as well as the purchase price that plaintiff paid for it"; that defendant's conduct constituted a flagrant breach of the restrictive covenant; and continued, 38 S.W.2d loc. cit. 493: "In so holding we do no violence to any recognized rule of strict construction applicable to contracts in restraint of trade. The construction of the covenant to which we adhere is fully justified by the fair and natural meaning of the language employed. Further, where the purpose of a covenant is to provide against competition, the parties should comply not only with the letter but with the spirit of their contract. The following authorities support our conclusion: Counts v. Medley, 163 Mo.App. 546, 146 S.W. 465; Clabaugh v. Heibner Mo.App., 236 S.W. 396; Morris-Forrester Oil Co. v. Taylor, 158 Ga. 201, 122 S.E. 680; 6 R.C.L. p. 874, par. 261; 13 C.J. 555, § 520 et seq."
In Foxworth-Galbraith Lumber Co. v. Turner, 121 Tex. 177, 46 S.W.2d 663, 87 A.L.R. 323, it appeared that the defendants sold to the plaintiff their retail lumber and building supply business at Littlefield, Texas, and agreed not to engage, either directly or indirectly, in the business of selling lumber or other building supplies at Littlefield, or at any place within a radius of ten miles for a period of ten years. The defendants opened a place of business about twelve miles from Littlefield, and began selling lumber and other materials to purchasers residing within the prohibited area. In holding that the plaintiff was entitled to injunctive relief, the court said, 46 S.W.2d loc. cit. 665: "The purpose of such covenant was to render effective the good will which appellant, under the contract, was buying and paying for. When such a covenant has been made, any conduct on the part of the seller of the good will, reasonably calculated to impair its advantages, clearly constitutes a breach of the promise that the seller will not disturb the purchaser in the full enjoyment of his purchase." Citing cases. In Richards v. Shipley, 257 Pa. 134, 101 A. 456, it was held that the seller of a coal business who had covenanted that he would not, for a stated period and within a certain area, become engaged or connected with any retail coal business or undertaking similar to that sold, might be enjoined from soliciting business within the restricted area and delivering coal therein from a yard opened by him outside such area. To the same effect are Love v. Stidham, 18 App. D.C. 306, 53 L.R.A. 397; Smithloff v. Weinman, 165 Ga. 449, 141 S.E. 205; Duffy v. Shockey, 11 Ind. 70, 71 Am.Dec. 348; Johnson v. Stumbo, 277 Ky. 301, 126 S.W. 165, and other cases cited and discussed in 87 A.L.R. 329.
In view of the authorities cited above and the undisputed evidence set forth in the first part of this opinion, it is clear that defendant violated the restrictive covenant in the contract of sale. It is equally clear that there is no merit in defendant's *283 contention that the restrictive covenant does not prohibit him from receiving orders at his Kansas City store from persons residing within the prohibited territory and delivering the goods so ordered to a common carrier, or other bailee, for transportation to such buyers. As pointed out in the cases cited above, the purpose of such a covenant is to secure to the purchaser the value of the business which is sold by prohibiting the seller from impairing the good will thereof by competition. If the defendant accepts orders from customers residing within the prohibited area and delivers the goods so ordered to a common carrier, or other bailee, for shipment to such customers, he would be in direct competition with plaintiffs, as much so as if he entered the prohibited area and made such deliveries in person. Having accepted the benefits of the contract, defendant should be required to comply with both the letter and the spirit of the restrictive covenant for the period stated therein.
It is our conclusion that plaintiffs were entitled to the equitable relief sought, and that the restrictions imposed on defendant by the decree are clearly justified by the contract and the evidence in this case. The judgment should be affirmed.
SPERRY, C., concurs.
PER CURIAM.
The foregoing opinion of BOUR, C., is adopted as the opinion of the court.
The judgment is affirmed.
All concur.