Roger E. HINKELDEY et al., Respondents,

v.

CITIES SERVICE OIL COMPANY, Appellant.

No. 55022.

Supreme Court of Missouri, Division No. 1.

Sept. 13, 1971.

Aaron A. Wilson, Kansas City, for respondents.

Thad C. McCanse, David A. Welte, James & McCanse, Kansas City, for appellant, Cities Service Oil Co.

HOUSER, Commissioner.

Seven ex-employees brought this action against Cities Service Oil Company for breach of a contract to grant them severance pay. Their claims aggregated $20,604.-85. Cities Service denied any liability in any amount. We have jurisdiction. O'Dell v. Division of Employment Security, Mo. Sup., 376 S.W.2d 137; Flanigan v. City of Springfield, Mo.Sup., 360 S.W.2d 700.

Plaintiffs' petition alleged that on and prior to July 31, 1966 there was a contract between Cities Service and its employees providing that a regular full-time employee whose employment was terminated by defendant, where no direct replacement was necessary, should receive severance pay of one week's pay for each completed year of service up to 10 years and one and one-half week's pay for each completed year of service after 10 years; that plaintiffs had completed from 5 to 25 years' service, entitling them to designated sums of money for severance pay; that as of July 31, 1966 plaintiffs' employment was terminated through no fault of their own and that they were otherwise qualified for severance pay; that demand was made but defendant refused to pay.

Cities Service answered that on July 31, 1966 it ceased its marketing operations in the Kansas City area and sold its properties to Gulf Oil Company; that on and prior to that date Cities Service had in effect a plan under which employees whose employment was terminated were eligible for severance pay if they were not offered jobs by Gulf but that employees who did not accept employment by Gulf were not eligible for severance pay; that plaintiffs were offered employment by Gulf; that none of plaintiffs were [sic] eligible for severance pay; that any severance pay plan

of Cities Service was voluntary and not contractual.

The case, tried to a jury, was submitted under Instruction No. 2 as follows:

### "INSTRUCTION NUMBER 2

"Your verdict must be for plaintiffs if you believe:

"First, that prior to July 31, 1966 plaintiffs received notification and knowledge from defendant of the severance pay plan provided in ER-1 (Revised November 15, 1962),
and

"Second, plaintiffs, in reliance upon the severance pay plan continued their employment with defendant until July 31, 1966, and

"Third, defendant *arbitrarily* withheld management approval of severance pay to plaintiffs."

The jury returned a verdict for each plaintiff in the full amount of his claim for an aggregate total of $20,604.85. Judgments were rendered on the verdicts and Cities Service appealed.

Plaintiffs' claims are based upon Paragraph II of the following document, referred to as "ER-1 Revised," dated November 15, 1962, which was prepared by the manager and staff of the Employee Relations Department at Tulsa, Oklahoma, approved by the President, Executive Vice-President, General Counsel and legal staff of Cities Service in New York, and distributed to the division managers throughout the country:

"CITIES SERVICE OIL COMPANY
60 WALL STREET
NEW YORK 5, NEW YORK
RE: EARLY RETIREMENT AND
SEVERANCE PAY POLICY

I. FOR RETIREMENT PLAN PARTICIPANTS WHO ARE 55 OR MORE YEARS OF AGE, WITH 15 OR MORE YEARS OF SERVICE

A. Early retirement benefits of the Retirement Plan will be made available to *employees whose services are terminated at the Company's option.*

B. In addition, the Company will pay special supplements, as follows:

1. *Until Age 62*

a. Supplement of one-half (½) the early retirement discount.

b. Supplement of $96.00 per month in lieu of Social Security to which the employee will be entitled at age 62.

2. *From Age 62 to Age 65*

a. Supplement of one-half (½) the early retirement discount.

3. *After Age 65*

a. Supplement for life of one-half (½) the early retirement discount, subject to reduction by any future increases in Social Security.

4. All Special Supplements will be discontinued in the event of the death of the employee.

II. FOR ALL EMPLOYEES NOT MEETING THE REQUIREMENTS OF SECTION I

A. Special severance allowances are provided, as shown on the attached schedule. This schedule allows one week's pay for each completed year of service up to ten (10) years and one and one-half week's pay for each completed year of service in excess of ten (10) years, up to a maximum of one year's pay.

B. *This severance allowance is not to be granted to employees who conclude their employment by their own choice.* Rather such severance allowance is to be extended only to a regular full time employee whose employment is terminated

by the company and for whom no direct replacement is necessary.

## III. APPROVALS

A. The application of any of these provisions for early retirement, supplemental benefits, or severance pay must be submitted to the Employee Relations Department for Management approval."

### "SEVERANCE ALLOWANCE

| Completed Years of Service | Severance Allowance |
|---|---|
| 1 Year | 1 Week |
| 2 Years | 2 Weeks |
| 3 " | 3 " |
| 4 " | 4 " |
| 5 " | 5 " |
| 6 " | 6 " |
| 7 " | 7 " |
| 8 " | 8 " |
| 9 " | 9 " |
| 10 " | 10 " |
| 11 " | 11½ " |
| 12 " | 13 " |
| 13 " | 14½ " |
| 14 " | 16 " |
| 15 " | 17½ " |
| 16 " | 19 " |
| 17 " | 20½ " |
| 18 " | 22 " |
| 19 " | 23½ " |
| 20 " | 25 " |
| 21 " | 26½ " |
| 22 " | 28 " |
| 23 " | 29½ " |
| 24 " | 31 " |
| 25 " | 32½ " |
| 26 " | 34 " |
| 27 " | 35½ " |
| 28 " | 37 " |
| 29 " | 38½ " |
| 30 " | 40 " |
| 31 " | 41½ " |
| 32 " | 43 " |
| 33 " | 44½ " |
| 34 " | 46 " |
| 35 " | 47½ " |
| 36 " | 49 " |
| 37 " | 50½ " |
| 38 " | 52 " "|

From the evidence considered in the light most favorable to the prevailing parties the jury could have found these facts: The primary purpose of a severance pay allowance was to help an employee during a period of time after he left Cities Service and before he found other suitable employment. The intent of the Employee Relations Department Manager in approving ER–1 Revised was to set forth the standards for all employees qualifying under its provisions for severance pay, subject to management approval. Although ER–1 Revised was not intended to be distributed generally to all employees and was not so distributed, it was not marked secret or confidential and department heads were not advised that it was secret and confidential. The Kansas City regional manager and his office manager each had a copy. The office manager's copy was kept in a policy book, or binder, in his office, where it was available with other company policy memoranda and data for reference and inspection by interested department heads. ER–1 Revised was the subject of at least one weekly department head meeting in the Kansas City division. While ER–1 Revised was not to be "displayed" to employees its contents were to be given out through the department heads by oral dissemination of the information to the employees. Staff employees were requested to pass the information on to the rank and file of employees. This was one of the customary methods used by Cities Service in disseminating information to employees of the division. In March 1963 Cities Service had printed and kept on hand a sufficient supply of cards captioned "Employment Termination Card," on which was provided a blank space for the number of weeks of severance pay due each employee.

Each of the seven plaintiffs knew about the severance pay plan. Four of them read it in the policy book. Plaintiff Kephart received knowledge of the plan from one of his superiors in 1962. Plaintiff Jones had heard of it through different employees. Plaintiff Hinkeldey first learned of the plan in January, 1964, when the Des Moines Regional Office was closed and the accounting facilities moved from St. Paul to Philadelphia, terminating jobs and giving rise to the payment of severance pay under the plan. At no time did the Employee Relations Office in Tulsa ever send "anything" to the Kansas City office revoking or cancelling authority under ER–1

Revised. There was evidence that before the controversy in litigation there were no instances in which Cities Service employees who were qualified to receive pay under ER-1 Revised were rejected or refused severance pay by management.

Plaintiffs and other employees in the Kansas City division were notified to attend a meeting at the Hotel President on April 18, 1966 at which time announcement was made of a proposed sale of Cities Service's market operations and properties in various places, including the Kansas City area, to Gulf Oil Corporation. The employees were not told when the sale and transfer would actually take place nor was severance pay or any change in the severance pay plan mentioned. Plaintiffs and other employees, apprehensive about their future employment situation as a result of this meeting, confirmed the existence of the severance pay plan. During the period April 18-July 19 the office manager in Kansas City received inquiries "probably from every employee in the division" about what was contained in ER-1 Revised. He gave the information to each employee who asked for it. Plaintiffs, relying upon the severance pay plan, knowing that if they resigned they would lose their severance pay and thinking that if they remained on the job they would upon termination of their employment receive severance pay which would assist them financially during the period of unemployment between jobs, decided to remain on the job and not quit to look for other employment. It influenced them to remain with Cities Service during the period of uncertainty about the future.

Around July 12, 1966 management reached a decision that there would be a severance pay program in connection with the sale to Gulf. Gulf supplied Cities Service with the names of those who would be offered jobs and those who were not to be offered jobs in the change-over. About the middle of July the Employee Relations Department prepared a document in connection with the change-over, (Exhibit A), under the terms of which employees terminated and not transferring to Gulf would be eligible for severance pay, but employees not accepting employment offers by Gulf would not get severance pay. This plan was approved by management. After the April 18 meeting the employees heard nothing more about the sale, date of transfer of property or any change in the severance pay plan until a second called meeting was held on July 19, 1966. At the meeting of July 19 it was announced that the change-over to Gulf would take place on July 31, 1966. Names were read of employees receiving early retirement benefits and those whose employment was being terminated. It was announced that those being terminated and not being offered employment by Gulf would receive severance pay but those whose employments were being terminated but who were offered employment by Gulf would not receive severance pay. Prior to July 19, 1966 plaintiff Hinkeldey, and inferentially the other plaintiffs, had not been advised that the severance plan was going to be changed.

Plaintiffs had employment tenures with Cities Service ranging from 5 years, 4 months to 25 years, 3 months. The jobs of each of the seven plaintiffs were terminated by Cities Service in the change-over to Gulf. Each plaintiff was offered employment with Gulf but many of the jobs required that they move to other cities or go into new lines of work with Gulf. While the salary would initially be the same salaries would be subject to review and revision, up or down, after six months. Each of the seven plaintiffs found these conditions unacceptable, refused employment with Gulf, and was denied severance pay under the change-over plan announced by Cities Service. Each of plaintiffs' employment termination cards was completed, showing "-0-" weeks' severance pay due because "Refused Gulf Offer to Transfer." Other Cities Service employees whose jobs were terminated and who were not offered jobs with Gulf were

given severance pay, while those offered jobs were not.

Cities Service raises two points on this appeal: I. That there was no contract; that the provision upon which plaintiffs rely required something further to be done which was not done, and that no offer was made and no offer was communicated to plaintiffs. II. That plaintiffs' verdict-directing Instruction No. 2 was not supported by the evidence.

## I. Contract *vel non*?

Appellant argues that to become effective the severance pay plan contained in ER–1 Revised required further action on the part of Cities Service (approval of the plan by management); that ER–1 Revised simply lays down certain guidelines which might (or might not) be used in formulating a plan for severance pay when a situation involving a surplus of employees might arise in the future; that management's approval of ER–1 Revised constituted merely an approval of the general principles as guidelines, but that for any severance pay plan to apply and become effective a plan or program would first have to be prepared and submitted to the Employee Relations Department for management approval; that the requirement of management approval in Par. III refers to management approval of a severance pay plan or program and not to approval of employees' applications for severance pay; that it was optional with Cities Service whether any proposed severance pay plan or program should become effective; that approval of severance pay to employees otherwise eligible under ER–1 Revised could be withheld arbitrarily by management; that there was nothing definite about ER–1 Revised and that it was not an offer; that it merely expressed company policy but was not designed to

give rise to any contractual obligation without something further occurring, and that that something never occurred because management never approved any plan for severance pay to persons whose jobs with Cities Service terminated but who were offered jobs with Gulf. Relying upon the principle of law stated in § 25 of the Restatement of Contracts [1] appellant argues that a promise or manifested intention which requires further assent to become effective cannot become a contract without that assent, and cites Cottonseed Delinting Corp. v. Roberts Bros., Mo.Sup., 218 S.W.2d 592, for the proposition that reliance upon what had been done in previous years does not give rise to a contractual obligation; Brown v. Childers, Mo. App., 254 S.W.2d 275, that there cannot be a contract as long as essential terms are reserved for future determination of the parties; Borden v. Skinner Chuck Co., 21 Conn.Super. 184, 150 A.2d 607, in which an employer was held not liable to employees for a bonus where employer's book stated that a customary year-end bonus depended upon earnings and was discretionary with the board of directors (that there was no offer to pay a bonus because a further expression from the employer was necessary); Spooner v. Reserve Life Ins. Co., 47 Wash.2d 454, 287 P.2d 735, holding that a bulletin issued by the company announcing a bonus but giving the employer power to withhold it or modify it individually or collectively was not actual offer, and Burns v. Lewis-Howe Co., Mo.App., 266 S.W.2d 14, holding that the bonus plan under the facts of that case was a gratuity and did not amount to a contractual obligation.

On the other hand, respondents contend that Par. III relates to approval of applications by employees for severance pay and not to approval of an entire severance pay program or plan; that ER–1 Revised

---

1. "If from a promise, or manifestation of intention, or from the circumstances existing at the time, the person to whom the promise or manifestation is addressed knows or has reason to know that the person making it does not intend it as an expression of his fixed purpose until he has given a further expression of assent, he has not made an offer."

was approved in 1962 by management (i. e., by the president, executive vice-president, general counsel and legal staff), has been in effect ever since, and that "the clear meaning of this paragraph is that applications by employees seeking severance pay must be submitted to management for approval of the applicant's qualifications, tenure and salary."

Paragraph III is ambiguous; its meaning is not readily apparent. Its true intent and meaning can be ascertained only by examining ER–1 Revised as a whole, and by considering the circumstances surrounding its issuance and its history.

When an employer prepares a written contract or offer to contract with its employees all ambiguities in the instrument are to be resolved strongly against the employer. If the employer chooses words with a double meaning the courts, in the interest of fair play, will construe the language in favor of the employee. McClintock v. Skelly Oil Co., 232 Mo.App. 1204, 114 S.W.2d 181, 190.

ER–1 Revised is headed by the word "POLICY" which, according to Webster's New International Dictionary, Second Edition, means "A settled or definite course or method adopted and followed by a government, institution, body or individual." A reading of ER–1 Revised does not necessarily convey the impression that the provisions of Par. II represent general principles, suggested guidelines, or mere advisory data to be taken into consideration in preparing a plan or program for severance pay. Paragraph III does not expressly or by implication make the time when Par. II takes effect contingent upon first obtaining management approval of the provisions of Par. II. Paragraph II envisions and constitutes a complete, definite, workable plan for severance pay. It supplanted ER–1, which was marked "temporary" and was devised for use in a particular isolated situation (as a result of the centralization of the company's accounting offices in Philadelphia), but ER–1 Revised was not marked "temporary," "proposed," "contingent" or "conditional." There were no other words or indicia suggesting that ER–1 Revised was intended merely as a model plan. Its wording indicates affirmatively that it has been adopted, and that upon acceptance by the employee will apply and be in force and effect. It does not say that severance allowances *"may* be provided" but says *"are* provided." It does not say that one week's pay for each completed year of service *"may* be allowed" but says "This schedule *allows* one week's pay, etc." It refers to "This severance allowance" and "such severance allowance"—not to "any severance allowance which may be made." The schedule specifying the severance allowance in weeks for years of service is certain and definite, not approximate or suggested. Paragraph III was not designed to require management approval of severance pay *plans* or *programs.* The document, read as a whole, with the attached schedule, bespeaks an intention to presently adopt and offer as the general severance pay policy of the company the detailed plan set forth therein. It was approved by top management. It represents the settled company plan for universal use in all severance pay situations that might arise. Following its approval by top management and promulgation in 1962 ER–1 Revised constituted a written general offer to the employees of severance pay rights which, upon acceptance, became a part of the employment contract of every employee accepting it. After its adoption in 1962 it was used when severance pay situations arose. Under it eligible terminated employees received severance pay according to its terms. We conclude that the words of Par. III requiring management approval of the application of the provisions of Par. II for severance pay mean that before the severance pay provisions of Par. II apply to the intended beneficiaries there must be management approval of eligibility (verification of the completed years of service, weekly wage and number of weeks of severance pay due) following submission of

the claims of employees to the designated department.

This disposes of appellant's contention that the only severance pay plan approved by management in connection with the transfer to Gulf was that set forth in Exhibit A, which provided severance pay benefits only to those who remained with Cities Service until release and were not offered jobs with Gulf.

█ Appellant claims, however, that there was no intention to make any offer under ER–1 Revised; that it was restricted in circulation and available only to department heads or their superiors; that at best ER–1 Revised was "a vehicle which could be used by management at its option when there was a surplus of employees"; that a proposal does not become an offer until it is actually communicated to the offeree by the offeror, citing ACF Industries v. Industrial Commission, Mo.App., 309 S. W.2d 676; Brown v. Childers, Mo.App., 254 S.W.2d 275, and Restatement of Contracts § 23; that one cannot accept an offer which has not been communicated to him, citing ACF Industries v. Industrial Commission, supra, and 17 C.J.S. Contracts § 38, p. 663, and that an offer under ER–1 Revised was never communicated to plaintiffs. The intention on the part of Cities Service to make an offer is evidenced by the direction of the Kansas City manager to department heads that the information with respect to ER–1 Revised be disseminated by staff employees to the rank and file of the employees of the division. It was not necessary to constitute an offer that Cities Service assemble the employees in a meeting and hand them written copies of ER–1 Revised. There was sufficient evidence of actual communication of the offer to the employees for the jury to make a finding that the offer was communicated. A method customarily used by Cities Service in disseminating information to employees of the Kansas City division was employed to communicate the offer. Acceptance of the offer is to be found in the fact that with knowledge of ER–1 Revised these plain-

tiffs continued in the service of their employer until their employment was terminated. Croskey v. Kroger Co., Mo.App., 259 S.W.2d 408, 412. In these circumstances an enforceable bilateral contract resulted, and granting or withholding severance pay under ER–1 Revised after acceptance was not optional with Cities Service. In such case severance pay is not a gratuity which may be allowed or disallowed arbitrarily, but is a contractual obligation. 56 C.J.S. Master and Servant § 98, p. 529; Scott v. J. F. Duthie & Co., 125 Wash. 470, 216 P. 853.

## INSTRUCTION NO. 2

█ Number 2 is not erroneous for lack of evidence that Cities Service arbitrarily withheld management approval of severance pay to plaintiffs. The evidence showed a general offer, an acceptance and a binding contract under which eligible and qualified employees were entitled to severance pay under ER–1 Revised but that management attempted to revoke this binding contract by the mandate in its Gulf change-over order that "Employees not accepting employment offer by Gulf will not be eligible for severance pay" and by management refusing benefits to plaintiffs. This is sufficient evidence to submit arbitrary withholding of severance pay. Appellant argues that since the purpose of severance pay was to benefit employees out of work because of abolition of their jobs and since plaintiffs, having been offered employment by Gulf, were not out of work, there was a rational basis for Cities Service's determination that plaintiffs were not entitled to severance pay and therefore the withholding was not arbitrary. This ignores the existence of a contractual duty, breach of which cannot be excused on the ground that it would be reasonable to do so. After acceptance of its offer Cities Service could not withdraw the proposal on any ground, reasonable or unreasonable.

There is no lack of evidence that plaintiffs relied on the severance pay plan and

no basis for appellant's contention that the only foundation of plaintiffs' reliance was hope that management would pay severance pay. As previously indicated, each of the seven plaintiffs testified that he continued in the service of Cities Service in reliance upon the severance pay plan.

There is no lack of evidence, as previously demonstrated, that plaintiffs received notification or knowledge from Cities Service of the severance plan provided in ER-1 Revised.

Appellant complains that No. 2 fails to hypothesize the controverted issues of offer and acceptance of offer, allows recovery upon a finding that plaintiffs received notification and knowledge of ER-1 Revised from Cities Service and assumes the controverted fact that ER-1 Revised constituted a definite offer upon which plaintiffs could rely and which they could accept by continuing in their employment. There was no necessity of submitting to the jury the question whether ER-1 Revised constituted an offer because the promulgation of the document by Cities Service (which is conceded) constituted an offer as a matter of law. Roberts v. Mays Mills, 184 N.C. 406, 114 S.E. 530, 532, 28 A.L.R. 338, 342: "The posting of the notice and offer of a bonus * * * was a proposal on the part of the mill * * * an offer to the employees then in the mill that, if they would remain until the end of the year, they would have the 10 per cent. bonus." Circulation among employees of an "Employees Handbook" containing a statement that a dismissal wage would be paid to employees laid off because of reduction of work or a shutdown was held to amount to an offer, in Hercules Powder Co. v. Brookfield, 189 Va. 531, 53 S.E.2d 804 [1]. A provision in a "supervisory and office personnel policy" that upon permanent termination of employment an employee would be paid separation pay was

held an offer, and not a mere gratuity to be paid at the whim or caprice of the employer, in Cain v. Allen Electric & Equipment Co., 346 Mich. 568, 78 N.W.2d 296 [1]. The court said, "An offer was made, not merely a hope or intention expressed. The words on their face looked to an agreement, an assent. * * * In short, the adoption of the described policies by the company constituted an offer of a contract." The court went on to hold that the offer was accepted by plaintiff continuing in employment beyond the period specified, and that the offer having thus been accepted "it was not within defendant's power to withdraw it when called upon to perform." 78 N.W.2d, l. c. 301, 302. For a voluntary plan of this kind "to become enforceable contracts the courts have required notification to and knowledge of the benefits on the part of the employee and consideration or continuance of employment in reliance upon the plan." Molumby v. Shapleigh Hardware Co., Mo. App., 395 S.W.2d 221, 226 [3]. The first paragraph of Instruction No. 2 submitted notification and knowledge (which is tantamount to communication of the offer). The second paragraph submitted continuation of employment in reliance upon the plan (which is tantamount to acceptance of the offer). There was no deficiency in No. 2 under the facts of this case.

The judgments are affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.