# Richmond

## Hercules Powder Company, a Corporation v. Thomas S. Brookfield.

June 20, 1949.

Record No. 3492.

Present, All the Justices.

The opinion states the case.

*George R. Humrickhouse, Robert N. Pollard, Jr., J. R. L. Johnson, Jr.,* and *Robert A. Fulwiler, Jr.,* for the plaintiff in error.

*Ted Dalton* and *Richard H. Poff,* for the defendant in error.

MILLER, J., delivered the opinion of the court.

This action was instituted by Thomas S. Brookfield, hereinafter called plaintiff, against Hercules Powder Company, hereinafter referred to as defendant. Judgment for $320 and interest, the sum claimed by plaintiff to be owing to him as dismissal salary under an employment contract, which he asserts that he and other employees had with defendant, was rendered by the trial court.

Defendant insists that (a) no contract for the payment of what is commonly called dismissal or termination of employment wages or salary was in effect with its employees, and (b) if any contract for payment of termination wages or salary existed, plaintiff did not bring himself within its terms.

On August 16, 1940, the United States Government entered into a contract with defendant whereby that corporation was to obtain the necessary land and erect and operate thereon for the Government an extensive plant for the manufacture of gunpowder. Approximately twenty-five hundred acres of land were acquired in the vicinity of Radford, Virginia, and a plant was constructed and operated.

It is referred to as the Radford Plant. Early in 1941, defendant, under and by authority of a second contract with the Government, took over operation of another nearby plant owned by the Government and known as "New River Ordnance Plant."

Plaintiff was employed by defendant on April 17, 1941, as Captain of the Guard Forces at the New River Plant. He continued in such position until December 3, 1945, when this plant was relinquished by defendant and turned back to the Government.

For about a year, the New River Plant was maintained and operated by the defendant under the separate contract applicable thereto. However, in 1942, active operation of that plant was suspended and it was placed in a stand-by condition. Plaintiff's employment was not interrupted by this inactivity, but during this period he continued in his same position. Upon reactivation of the plant in 1943, the service to be rendered was enlarged and its maintenance and operation were transferred to and placed under the original contract for the operation of the Radford Plant. In short, when reactivated, it was brought under the Radford Plant contract and theerafter continued to be operated under its terms.

In that part of the contract which had to do with "Extra compensation to employees, any discontinuance wages, etc.", we find this provision:

"In the payment of extra compensation and in the making of expenditures pursuant to or in the maintenance of welfare or other plans for the benefit of employees, the Government shall be chargeable therefor insofar as the same are consistent with the . Company's general employee-relations throughout its organization * * * ; it being intended that the employees of said plant shall be treated no less favorably than employees of other plants of the Contractor. * * * ."

On August 12, 1943, defendant received from the War Department an inquiry concerning what, if any, employee termination pay plan was used by it. The inquiry reads, in part, as follows:

"Did the operating contractor, as part of his Employee Relations Plan, have a termination pay plan in effect prior to 3 October 1942? If so, furnish an excerpt of the plan listing the termination pay provisions."

On November 23, 1943, defendant replied at length. It set out in detail the history of the Company's plan which had been in effect for twelve years. In this communication, the Government's approval of an amended plan was requested. That amendment was embodied in two resolutions of March 23, and November 9, 1943, respectively, which had to do with wage-roll employees and salary-roll employees. Though these resolutions apply to different classes of employees, they are, in purpose and effect, the same. That specifically applicable to "Pay Roll Employees," to which group plaintiff belonged, reads:

"Resolved, That the following Dismissal Payment Plan for salary-roll employees of this Company be, and is hereby adopted:

"Department managers are authorized within their discretion to grant dismissal payments, within the following limits to salary-roll employees who are laid off from time to time for indefinite periods. * * * " (The scale of payments are then recited)

The original contract of August 16, 1940, under which both plants were being operated was amended on February 9, 1944. The only provision added that is pertinent to this inquiry was to the effect that defendant should make every reasonable effort to effect settlement of all obligations, commitments and claims which were reimbursable by the Government under the contract.

Though such contemplated settlements were to be subject to written approval by the Government's contracting officer, it recognized and reaffirmed its responsibility for any judgment rendered against defendant upon any obligation, commitments or claims which were reimbursable under the provisions of the contract.

During the latter part of 1944 and early 1945, written

communications passed between defendant and the Government relative to the administrative procedure contemplated in the payment of dismissal wages and salaries. In its letter to the Government's contracting officer, defendant advised that the dismissal wage and salary plan recommended in the resolutions of March 23, and November 9, 1943, had been approved by the War Department Wage Administrative Agency and that it was to be made effective in the plants upon approval by the contracting officer. Its letter of January 4, 1945, to that effect, reads, in part:

·"It is proposed that the dismissal wage and salary plan will become effective in * * * (names of all Hercules operated plants set out) * * * upon the date of the approval of this letter by the contracting officer for the Government or his duly authorized representative. Notice of the adoption of the plan and its principal features will be announced to all employees at these plants immediately following such approval. This action will help in the recruit of labor, is essential in holding employees on war work during this critical period, and will serve as a means of achieving an orderly plant shutdown.

"Dismissal Wages and Salaries will be paid to all employees who are terminated after the date of the approval of this letter due to any reduction in force, but the plan will not be applied in any instance of voluntary separation by the employee, in any instance where the employee is discharged 'for cause' or in any instance where instead of being terminated, an employee is transferred to another Hercules plant or office * * * .

"No employee shall receive dismissal wages or salary unless such employee is terminated due to a reduction in force. The fact, however, that an employee who receives dismissal pay from the company is later rehired by Hercules Powder Company or the Government at the same plant or elsewhere shall not warrant the refund of any or all of the dismissal pay which such an employee had received. * * * .

"The Government shall reimburse Hercules Powder Com-

pany for all costs of administering the foregoing plan and for all dismissal wages and salaries which are paid pursuant thereto. * * * ."

By written communication of January 29, 1945, the Government's contracting officer approved the plan recommended, and added—"since I find as a fact that such plan is necessary to the work being performed under such contracts; * * * ."

An article or notice was published March 16, 1945, in defendant's newspaper, the Radford Plant Weekly, announcing to its employees and the public that the dismissal wage and salary plan had been approved by the Government and put into effect by defendant.

Two weeks later, defendant circulated among its employees at the plants a revised edition of its "Employees Handbook." Its stated purposes were to advise the employees that defendant was operating under a contract with the Government, but that they were employees of the company, and to acquaint them with the conditions under which they worked and with the policies, plans and other services in effect at the date of its issuance. It contained three major headings devoted to Working Conditions, Special Information and Industrial Relations Plans. The third heading or chapter, which, among other things, deals with the Wage Dismissal Plan begins with this paragraph:

"Hercules Powder Company sponsors the plans outlined on the following pages to take care of such matters as insurance, sickness, military duty, vacations, and similar matters. Necessarily, the following are only brief outlines of such plans as they are in effect at present. They are subject to discontinuance or change from time to time. The office superintendent or personnel superintendent will be glad to furnish you with up-to-date details at any time."

The concluding paragraphs of this major heading of the pamphlet are set forth under a sub-heading entitled "Dismissal Wages and Salaries" and reads, in part:

*"In addition to all wages or salaries earned for work*

*performed, a dismissal wage or salary will be paid to any eligible employee who is laid off for an indefinite period because of a reduction in forces or in the event of plant shut-down. No employee, however, will receive a dismissal wage or salary if he 'quits' or if he is discharged 'for cause'.* (Italics supplied.)

"As approved by the Government, the service requirements and schedule for payment of dismissal wages and salaries are as follows: * * * (the schedule is then set out) * * * . Dismissal wages and salaries are subject to the general provisions applicable to the company's Industrial Relations Plans, and further information can be obtained through your department head."

On April 1, 1945, a manual designated as a revised edition of "Supervisors Procedure Manual" was given to the plant supervisors. A portion of this manual dealt with the subject of dismissal wages and salaries. It assured employees that—

"Dismissal wages and salaries will be paid to all employees who are terminated after the date of the approval of this letter due to any reduction in forces, (but the plan will not be applied in any instance of voluntary separation by the employee, in any instance where, intsead of being terminated, an employee is transferred to another Hercules plant or office.) * * *

"The fact, however, that an employee who receives dismissal pay from this company is later rehired by Hercules Powder Company or the Government at the same plant or elsewhere shall not warrant the refund of any or all the dismissal pay which such an employee had received."

On August 15, 1945, defendant was informed by the Government that all further production under the contract was terminated. Upon receipt of this notice, it undertook and proceeded to prepare the plants for return to the United States Army Engineer Corps which was to take charge on behalf of the Government. The turnback to the Government actually took place on December 3, 1945. Reduction in the force of employees, who numbered about

13,000, was undertaken and accomplished as speedily as practicable. Those laid off were paid their dismissal wages in accordance with the schedule previously announced by defendant in its Employees Handbook.

About November 1, 1945, plaintiff and certain other employees of defendant were contacted by an officer of the United States Army Engineer Corps with a view of obtaining their services for the Government to start on the date when the plant was actually taken over by the Corps of Engineers. That date had not then been definitely fixed though it was expected to occur in the near future. In a day or two after this interview and pursuant thereto, plaintiff, on November 2, 1945, filed his application with the United States Civil Service Commission for the position of guard and agreed to accept appointment and serve as such anywhere in the United States. Later that month, he was assured that he would receive such an appointment and be assigned to duty at the plant.

The Government notified defendant on November 28, 1945, that it was to turn over the plants to the Army Engineer Corps on December 3, 1945. Pursuant to this notice and contemplated return of the plants to the Government and after plaintiff was aware that he had been accepted as a guard with the Engineer Corps, effective as of December 4th, the defendant, on November 29, 1945, advised its employees at the New River Plant that those who transferred directly to the payroll of the Corps of Engineers would receive no dismissal wages.

Notwithstanding this notification of which plaintiff was aware, he accepted the tendered position as Captain of the Guards with the Army Engineer Corps on December 4, 1945. He continued to hold that position with the Engineer Corps until disposal of the plant in 1946.

These are the salient and controlling facts upon which judgment in favor of plaintiff was entered in the trial court.

It is an uncontroverted fact that plaintiff continued in the employ of defendant until the shut-down on December 3rd,

and then took employment with the Army Engineer Corps. He testified that he could have obtained other employment, but the offer or promise published in the Handbook induced him to remain in his position with defendant. In answer to a question as to the effect upon him of the Dismissal Pay Plan and its publication in the Handbook, he said: "It made me stay on there in the plant."

In his new employment with the Engineer Corps his duties were somewhat different and his pay less.

The first and primary question presented is: Was the offer of dismissal pay a mere promise of a gratuity revocable at will, or was it an offer in reasonably sufficient terms, the price or consideration to be rendered therefor by the employees being their continued service with the defendant until laid off by shutdown or reduction of forces?

Defendant claims that the underlying motive and purpose of the plan was to cushion the shock of unemployment and ease the hardship upon employees incident to obtaining and removing to a new place of employment. It is insisted that the language used clearly indicates a reserved right to discontinue or change the plan at any time prior to termination of an employee's services. Bluntly stated, the defendant asserts that no offer was made and therefore none could be accepted by any employee, notwithstanding how faithfully and fully he complied with any and all conditions to merit the promised compensation.

There is ample evidence, both documentary and oral, to support plaintiff's contention that the offer to pay dismissal salary and wage was not solely to cushion the shock of unemployment but a material reason therefor was to secure and retain the services of competent employees under difficult and critical labor conditions then obtaining.

The evidence discloses that a considerable force was maintained solely to recruit employees and prevail upon them to continue working at the plants.

Plaintiff insists that the offer or promise made by defendant that payment of dismissal wage or salary would be made

was contained in reasonably sufficient terms and the consideration to be rendered by an employee was his continued satisfactory service with the company for the period or periods mentioned in the offer. Performance of the condition imposed, he asserts, is a full and complete acceptance of the offer.

With this we agree. Through and by compliance with the terms of the offer, plaintiff necessarily had to and did forego his right to seek and accept other employment and affirmatively met all conditions imposed by rendering service to the defendant for the period and until the specified time.

Ample authority sustains the view that such a promise amounts to an offer, which, if accepted by performance of the service, fulfills the legal requirements of a contract. Factually much to the point and adhering to this view is *Roberts* v. *Mills*, 184 N. C. 406, 114 S. E. 530, 28 A. L. R. 338, where it is stated at p. 410:

"It has become a very general policy with large employers of labor to offer a bonus or additional compensation to employees who shall render continuous and efficient service for a specified period of time. This is not a gratuity or gift, but is an offer on the part of the employer, with whom the offer originates in order to procure efficient and faithful service and continuous employment, and when the employee enters upon the service upon that inducement it becomes a supplementary contract of which he cannot be deprived without sufficient cause."

Also in point are *Scott* v. *Duthie & Co.*, 125 Wash. 470, 216 P. 853, 28 A. L. R. 328, and the text of 35 Am. Jur., "Master and Servant," sec. 71, p. 502.

Plaintiff was under no obligation to continue in defendant's employ. That his reliance upon and continued service because of the promise is sufficient consideration to support the contract and makes the agreement complete is decided in *Kerbaugh* v. *Gray*, 212 F. 716, at p. 717:

"The objection mainly relied upon at the trial and here

was that this promise of a bonus, if made, was *nudum pactum* because the plaintiff, being bound to do his best for his salary, gave nothing in the way of consideration to support the promise of a bonus. This would be true if the plaintiff were legally bound to continue in the employment of the defendant to the end of the season. But he was not and could have quit work at any time. *Martin* v. *New York Life Ins. Co.*, 148 N. Y. 117, 42 N. E. 416. Therefore the jury had a right to find that he continued in the employment after this promise of a bonus, relying upon it."

 Nor do we find merit in defendant's contention that the following quoted provision contained in the private exchange of communications between defendant and the Government and which the Government approved, but of which provision plaintiff was not cognizant, *i. e.*, "Department managers are authorized within their discretion to grant dismissal payments * * * .", renders the offer subsequently made in the Handbook illusory and no offer, in fact.

It is suffifficient to say that it was no part of the offer made to the plaintiff for his continued service and the statement in the Handbook that it was but a brief outline of the company's Industrial Relations Plan was inadequate and insufficient to nullify or impair the positive nature of the promise to pay dismissal salary made and communicated by the defendant to the plaintiff and relied upon by him.

In 56 C. J. S., "Master and Servant", sec. 98 a, p. 529, we find:

"The offer of a bonus may not be arbitrarily withdrawn when to do so would perpetrate a fraud on those who, in good faith, attempted to perform the service; nor does a condition that the officers of the employing company shall be the sole judges as to what bonus, if any, shall be paid authorize the arbitrary withholding of a bonus payment; nor can an employee's right to a bonus be defeated by the mere inaction of his employer or of the latter's officers."

Nor did the above-quoted provision impose any obligation upon him of further inquiry. The evidence discloses that

had inquiry been made at any time prior to November 28, 1945, by an employee who contemplated accepting employment with the Engineer Corps as to his right to dismissal pay, the Supervisor's Procedure Manual would have disclosed nothing that limited or made his right to dismissal pay subject to the discretion of the Department Manager.

The Handbook stated in the chapter or heading dealing with "Industrial Relations Plan" that the plans in effect, "are subject to discontinuance or change from time to time." Relying upon this provision, defendant contends that it had a right to discontinue the dismissal wage plan on November 29, 1945, without legal liability to any employee who accepted employment with the Engineer Corps, though his term of employment with defendant had on that date met the requirement as to length of service and all other conditions.

We agree that the right of discontinuance of the plan to any unearned benefits was reserved by defendant. Yet, it could not be discontinued and thus deprive the plaintiff of benefits of dismissal salary already earned as of the date of its discontinuance. That would constitute not mere discontinuance of the plan, but forfeiture of plaintiff's contractual rights amounting to a breach of the contract.

As the evidence sustains the finding of the trial court that defendant was indebted to plaintiff in the principal sum of $320, we find no error in the allowance of interest from the date upon which that sum became due and payable. Section 6259, Code, 1942. *Parsons* v. *Parsons*, 167 Va. 374, 189 S. E. 448.

The judgment of the trial court is affirmed.

*Affirmed.*