**Daniel G. THOMPSON, Plaintiff,**

v.

**AMERICAN MOTOR INNS, INC., Defendant.**

**Civ. A. No. 83–0013–A.**

United States District Court, W.D. Virginia, Abingdon Division.

Dec. 4, 1985.

Mary Lynn Tate, Abingdon, Va., for plaintiff.

S.D. Roberts Moore, Roanoke, Va., for defendant.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

Daniel G. Thompson, plaintiff, a resident of Virginia, brought this action against his former employer, American Motor Inns, Inc., a Virginia corporation, alleging breach of contract and unlawful discrimination based upon age. Plaintiff contends that he was given no warning notice as provided for in defendant's Employee Handbook and alleges that age was the motivating factor in the decision to fire him. Defendant contends that plaintiff was an at-will employee, and, therefore, its termination of plaintiff's employment was not a breach of contract nor was the decision based on age.

The court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 626(c). The parties chose not to have the case heard before a jury as provided for in 29 U.S.C. § 626(c)(2). The court agreed to await the presentation of evidence concerning the amount of damages pending the outcome of the breach of contract claim. At the close of plaintiff's evidence defendant made a motion for a directed verdict on the breach of contract claim on grounds that plaintiff was an at-will employee. The court stated that based on the testimony it could not grant defendant's motion.[1] After all the evidence had been presented, this court ruled from the bench that Thompson failed to prove a meritorious claim of unlawful age discrimination. The court found that although plaintiff had made a prima facie case of discrimination, defendant had shown a legitimate nondiscriminatory reason for firing which plaintiff had failed to rebut by a showing of pretext. The parties were given time to brief the remaining issue.

1. See *Ellis v. International Playtex, Inc.,* 745 F.2d    292 (4th Cir.1982).

The remaining issue concerns (1) plaintiff's status as an employee at will or as an employee under a contract, and (2) if a contract governs the working relationship, whether defendant breached the contract when it fired Thompson. The court must determine whether in these circumstances the policies and procedures incorporated into the employee handbook, which was distributed to each new employee, constituted a binding agreement on the part of this employer to follow its own policy for firing employees. In essence, the court must determine if this employee handbook is contractually binding on American Motor Inns.

### I.

Thompson was hired on May 8, 1978 as a full time desk clerk for the Marion, Virginia Holiday Inn and later assumed the additional duties of a night auditor. American Motor Inns, Inc. (AMI) operates Holiday Inns throughout Virginia, and other states. AMI gives each new employee an employee handbook when hired and requires that it be read. Each new employee is required to sign a copy of the Benefit Checklist (in the back of the handbook) and a copy of the Employee Conduct Code. The signed copies are then placed in the employee's personnel file. The purpose served by this procedure is to indicate to AMI that the employee understands the rules, regulations and benefits associated with AMI employment. Ms. Lowe, the General Manager of the Marion Holiday Inn, was responsible for ensuring that each new employee was aware of and understood AMI policies. She also was responsible for hiring Thompson and instructing him in the requirements and procedures of his job.

The employee handbook provides, *inter alia*, that new employees have probationary status for ninety (90) days after which they become permanent employees.[2] The handbook specifically sets out a warning procedure which is to be used to give an

employee verbal and/or written notice that he has committed an infraction of the employee conduct code. This notice-warning procedure serves two purposes. First, it gives an employee notice of what type of conduct will not be tolerated by AMI. Second, it gives AMI "just cause" for firing an employee who has demonstrated that he cannot comply with AMI policies.

The employee conduct code is given to the new employee on a separate one page printed form and is incorporated by reference into the employee handbook. The first section lists ten acts which may give rise to "just cause for immediate dismissal."[3] The second section, which is the notice-warning section, lists seventeen acts which "may be considered just cause for remedial action which could range from oral or written reprimand to suspension from work without pay to dismissal."[4] The conduct policy also states that "these rules are placed in written form for the benefit of you and your fellow employees so that all employees will receive the same fair treatment." According to the employee handbook, this conduct policy was to be posted in several locations within each Inn.

This conduct policy, incorporated into the AMI Employee Handbook at pages 3 and 4, is followed by the warning procedure section. That section provides:

> Your Inn uses a written and verbal warning notice system to make certain you receive a full explanation of any shortcomings and that you understand the seriousness of the matter.

> Employees who fail to meet performance standards; who violate company policy; or who fail to follow company rules will be given verbal and/or written warning notices.

> Three (3) warning notices will result in dismissal.

> Severe infractions, such as dishonesty, drunkeness [sic], insubordination, or im-

---

**2.** AMI Employee Handbook, at 2.

**3.** *See* Defendant's Exhibit #5. AMI Employment Conduct Policy A.1–10.

**4.** *See* Defendant's Exhibit #5, AMI Employment Conduct Policy B.11–27.

morality will not be tolerated and are grounds for immediate dismissal without a warning notice.

The course of events which led to Thompson's firing is as follows.

On the night of January 11, 1982, Mr. McColliam, houseparent for the Mount Rogers Shelter Home for Children, was forced to remove five children from the home and find other accommodations.[5] Thompson was on duty when McColliam came to the Inn.[6] McColliam filled out the registration form for two rooms but did not indicate the number of people in his party. At no time did McColliam mention that children were in his party. When McColliam attempted to pay for the rooms with a personal check, Thompson told him that company policy required proper identification in order to accept payment by personal check.[7] McColliam had neither his driver's license nor any type of identification with him. Thompson called other area motels to inquire if they would accept McColliam's personal check without identification. The responses were negative. McColliam left with no mention of who he was or why he needed the rooms.

On January 16, five days later, Mrs. Rosamond McCarty, a member of the board for the Mount Rogers Home, wrote a letter to Mr. Adolph Krisch, chairman of the board of AMI, copying to Mr. Bill Lemmon, owner of the property leased to AMI, complaining of the incident. (Exhibit # 1) On January 18, Krisch wrote to Mr. Poff, Senior Vice President and Regional Supervisor, instructing him to immediately fire Thompson. (Exhibit # 2) A copy of this letter was sent to Mrs. McCarty, Mr. Lemmon and Ms. Lowe. Ms. Lowe questioned Thompson about the incident, and determined he had followed company policy and had done nothing wrong when he turned McColliam away.[8]

Poff referred the matter to Mr. Graham, the area supervisor. Graham met with Mr. Lemmon, and then with both Ms. Lowe and Mr. Thompson. He determined the incident had occurred essentially as stated in Mrs. McCarty's letter. However, he did not talk with Mrs. McCarty or Mr. McColliam. Graham reported back to Poff, who told him to tell Thompson he was fired as of January 22.[9]

## II.

As a preliminary matter, the court notes that it retains jurisdiction over the breach of contract claim despite dismissal of plaintiff's claim under 29 U.S.C. § 621, et seq. Cf., United Mine Workers of America v. Gibbs, 383 U.S. 715, 725–726, 86 S.Ct. 1130, 1138–1139, 16 L.Ed.2d 218 (1966) (Court retained jurisdiction over pendant state law claim when federal claim was dismissed before trial). In the case sub judice, both issues were tried and this court now assumes pendant jurisdiction over the breach of contract claim.

### A. THE ERODING DOCTRINE OF EMPLOYMENT AT–WILL

In order to determine if plaintiff has a cognizable claim, this court must look to the law of Virginia to establish whether plaintiff was merely an at-will employee or an employee working pursuant to a contract. The law in Virginia concerning employment at-will is undergoing change just as it is in many, if not all, states.[10] The

---

5. The reason they were forced to leave was that the electricity had gone off and the temperature outside was around ten degrees below zero.

6. Thompson testified that he saw two vehicles drive under the carport, but was unable to see inside either vehicle.

7. The record shows that AMI did not dispute that it was company policy to require proper identification upon registration when a guest indicated payment was to be by personal check.

8. Ms. Lowe further testified that Thompson was an excellent employee and that his personnel file contained no complaints or warnings.

9. The effective date of Thompson's termination was February 8, 1982 due to accumulated sick leave and vacation time.

10. For an interesting discussion and analysis of the evolution of the employment at-will doctrine, see Note, Employee Handbooks and Employment At-Will Contracts, 1985 Duke L.J. 196.

anachronistic doctrine of employment at-will has not been blindly followed. Instead, many courts, including the Virginia Supreme Court, have limited its application. Courts which have considered the issue of whether terms within employee handbooks or company policy manuals are contractually binding on the employer are split in their decisions.[11] However, exceptions have been carved out of the antiquated doctrine of employment at-will in order to recognize that employment relationships in certain circumstances are often subject to terms and conditions of implied contracts.[12]

The precise issue, as presented by the facts of this case, has not yet been resolved by the Virginia Supreme Court. But the path followed by the Virginia Supreme Court—that of traditional contract analysis—in cases touching on the doctrine of employment at-will [13] will guide this court in determining whether the AMI Employee Handbook contains enforceable contract provisions as will the principles gleaned from other cases that dealt with the same issue.

The author states that as of 1983, twenty-nine states had granted some form of common law exceptions to the at-will doctrine; five other states, as well as the District of Columbia, have indicated their willingness to do so (at 199).

**11.** For cases demonstrating courts' unwillingness to give contractual force to such documents see cases cited in *Woolley v. Hoffmann-LaRoche, Inc.,* 99 N.J. 284, 491 A.2d 1257, 1262 (1985) and in *Barger v. General Electric,* at 1161, n. 8, and 1985 Duke L.J. 196, 205 at n. 48. For cases in which enforceable contract rights have been found see *Barger,* at 1164, n. 8, and 1985 Duke L.J. 196, 205 at n. 48.

**12.** Over the years the courts have generally recognized three types of modifications of the employment at-will rule: (1) public policy exception; (2) tort theory exception (or the duty of good faith and fair dealing); and (3) implied contract exception. Comment, *Protecting Employees At-Will Against Wrongful Discharge: The Public Policy Exception,* 96 Harv.L.Rev. 1931, 1935 (1976).

**13.** *See, e.g. Hercules Powder Co. v. Brookfield,* 189 Va. 531, 540, 53 S.E.2d 804, 808 (1949), *Dulany-Foods, Inc. v. C.A. Ayers,* 220 Va. 502, 508–09, 260 S.E.2d 196, 201 (1979) and *Fraizer v. Colonial Williamsburg Found.,* 574 F.Supp. 318,

## B. THE LAW IN VIRGINIA

Virginia follows the doctrine of employment at-will. *Conrad v. Ellison-Harvey Co.,* 120 Va. 458, 466, 91 S.E. 763, 766 (1917); *See Barger v. General Electric Co.,* 599 F.Supp. 1154 (W.D.Va.1984). Virginia also recognizes that a general hiring is terminable at the will of either party in the absence of a statute, custom or contract fixing the term and the conditions. *Cales v. Chesapeake & Ohio Ry. Co.,* 300 F.Supp. 155, 157 (W.D.Va.1969) (citing *Title Ins. Co. v. Howell,* 158 Va. 713, 718, 164 S.E. 387, 389 (1932)). And similarly, it is settled doctrine in Virginia that where no specific time is fixed for the duration of an employment, there is a rebuttable presumption that it is an employment at-will, terminable at any time by either party. *Norfolk Southern Ry. Co. v. Harris,* 190 Va. 966, 976, 59 S.E.2d 110, 114 (1950). The court in *Norfolk Southern,* 59 S.E.2d at 115, recognized that an employer's agreement not to dismiss without just cause rebutted the presumption and, thereby, fixed the duration of the employment.[14]

320 (1983) and *Barger v. General Elec.,* at 1161 (both relying on Virginia law to hold provisions binding on employer).

The recent case of *Bowman v. State Bank of Keysville,* 229 Va. 534, 331 S.E.2d 797, 801 (1985), upon which AMI has placed much reliance, is inapposite for this case. That case recognized an exception to the at-will doctrine by acknowledging a cause of action in tort for violation of established public policy in connection with Bowman's wrongful discharge.

**14.** The court found that

the employment was, by the terms of the contract, to continue until the plaintiff gave to the defendants just cause to end it ... The defendant's agreement that it would not discharge plaintiff without just cause was a thing of value to him, a safeguard against the loss and embarrassment to be expected from an arbitrary discharge. The defendant's agreement that it would not be done was a term of plaintiff's employment, compensation for his work which he had earned along with his wages. The defendant ought not to take that promised reward from him without incurring a penalty for violating its agreement. It was a promise in return for services which plaintiff performed and which furnished sufficient consideration for a binding contract.

Recently in *Barger,* at 1156, the district court applied Virginia law and concluded that where there was an employment policy in effect, the duration of that employment was fixed. The plaintiff had challenged the company's reduction in force policy contending that G.E. did not offer him a position that was within his path of progression and to which he was entitled under the terms of the Employee Handbook. The issue presented in *Barger,* at 1158, was whether the employee handbook provisions could be construed as enforceable and contractually binding. One conclusion drawn from the very thorough analysis of the at-will doctrine in Virginia by the court was that the at-will doctrine is not a substantive rule of law but is merely a rebuttable presumption. *Barger,* at 1159. The court further stated, at 1161, that courts may find that an employer has contractually surrendered his right to terminate at-will when, e.g., the circumstances create an implied unilateral contract.

The court in *Barger,* at 1161, summarized the important principles of Virginia law in connection with the at-will doctrine.

First, an employer may make several different promises in addition to a promise of salary in exchange for the employee's single promise to faithfully render his services; there is no failure of consideration so long as both parties have made some obligation. Second, an employer can contractually surrender his power to terminate at-will. Even if the employee can still quit at will, the contract is not void for lack of consideration; there is no requirement of complete mutuality of obligation. Third, an employee's continued service and his failure to exercise his power to terminate his employment is sufficient consideration for an additional promise by the employer which modifies the terms of the employment contract.

## C. RECENT DEVELOPMENTS IN OTHER JURISDICTIONS

Courts in other jurisdictions faced with the question of the enforceability of provisions in employee handbooks resorted to rules of construction to find implied and enforceable contractual rights. The analysis developed in cases such as *Toussaint v. Blue Cross and Blue Shield,* 408 Mich. 579, 292 N.W.2d 880 (1980), *Cleary v. American Airlines,* 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (1980), *Weiner v. McGraw-Hill,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982), and the cases discussed below, is applicable to the facts before this court. Those cases are also illustrative of the issue to be decided in the case *sub judice.*

Recently the New Jersey Supreme Court in *Woolley v. Hoffmann-LaRoche, Inc.,* 99 N.J. 284, 491 A.2d 1257 (1985), heard a case similar to the one at bar. In his action for breach of contract, plaintiff claimed that the express and implied promises in defendant's employment manual created a contract under which he could not be fired at-will, but rather only for cause, and then only after the procedures outlined in the manual were followed. Hoffman-LaRoche had distributed an "apparently carefully thought-out policy manual" intended to cover all of its employees. The court stated that when such a policy manual is involved there is no individual lifetime contract, rather, if there is a contract, it is one for a group of employees for an indefinite term and one that when fairly read may not be terminated by the employer without good cause. *Woolley,* 491 A.2d at 1263.

The court discussed controlling case law and found that those cases had dealt only with individual contracts for lifetime or long-term employment for particular employees. It distinguished those cases on the basis that none involved a contract put forth by the employer applicable to all employees, such as the company promulgated policy manual at issue. The court pointed out that the at-will rule has been severely criticized by commentators who argue that the rule no longer works in today's economic climate, and it made clear its intention not to adhere to rules regularly leading to the conclusion that an employer can fire an employee at-will, with or without just cause. *Woolley,* at 1261. The court opined

that the underlying interests involved in the relationship between the employer and its workforce call for compliance by the employer with certain rudimentary agreements voluntarily extended to the employees.

One of the court's justifications for finding that the terms in the Personnel Policy Manual were binding on Hoffman-LaRoche was that in light of the context of the manual's preparation and distribution it would be almost inevitable that an employee would regard it as a binding, legally enforceable commitment due to the appearance of corporate legitimacy. The court concluded that

> unless the language contained in the manual were such that no one could reasonably have thought it was intended to create legally binding obligations, the termination provisions of the policy manual would have to be regarded as an obligation undertaken by the employer. It will not do for the company to say it did not mean the things it said in its manual to be binding. Our courts will not allow an employer to offer attractive inducements and benefits to the workforce and then withdraw them when it chooses no matter how sincere its belief that they are not enforceable.

*Woolley*, at 1265–66.

Another justification for finding an implied contract from the terms and conditions set forth in the manual concerned the job security provisions. The court stated that

> the reasons for giving such provisions binding force are particularly persuasive. Wages, promotions, conditions of work, hours of work, all of those take second place to job security, for without that all other benefits are vulnerable.... Job security is the assurance that one's livelihood, one's family future, will not be destroyed arbitrarily; it can be cut off only for good cause, fairly determined. Hoffman-LaRoche's commitment here was to what working men and women regard as their most basic advance. It was a commitment that gave workers

protection against arbitrary termination.... Whatever Hoffman-LaRoche may have intended, that which was read by its employees was a promise not to fire them except for cause.

*Woolley*, at 1266.

The court applied traditional rules of contract interpretation in analyzing the terms and conditions in the employee manual in light of the surrounding circumstances. It concluded that the employee manual was a binding unilateral contract. The court found (1) that the manual was an offer seeking continued work in compliance with company policy; (2) that acceptance was manifested by the employees' continued work; and (3) that consideration was provided by the employees' continued work when they had no obligation to continue. The court adhered to the principle that as long as some consideration is furnished the quantity or quality is of no consequence to the binding effect of a promise.

This court agrees with the reasoning in *Woolley*. *Cf. Norfolk Southern Ry. Co. v. Harris*, 59 S.E.2d at 115 (where the court discussed consideration for employer's promise not to fire without just cause). *See also Kiser v. Amalgamated Clothing Workers*, 169 Va. 574, 583–85, 194 S.E. 727, 731 (1938) and *Twohy v. Harris*, 194 Va. 69, 81, 72 S.E.2d 329, 336 (1952) (where the court discussed consideration being furnished by an employee's foregoing of his right to quit). *See also, Barger v. General Electric*, at 1161 (where the court summed up the at-will doctrine in Virginia).

In another recent and persuasive case the Washington Supreme Court used an implied contract analysis to construe terms in an employment policy manual. The court in *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081, 1087 (1984) adopted the approach taken by a number of courts that

> an employer and employee can contractually obligate themselves concerning provisions found in an employee policy manual and thereby contractually modify the terminable at-will relationship.... Under this approach the requisites of con-

tract formation, offer, acceptance and consideration are necessary predicates to establishing that policies in an employment manual are part of the employees' original employment contract as modified by the parties. *Accord, Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 292 N.W.2d 880 (1980); *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (1983).

The court in *Thompson* held in part:

> that if an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship.

Denial of defendant's motion for summary judgment in *Thompson*, however, was premised on a public policy exception to the at-will doctrine for wrongful discharge. The court recognized a cause of action in tort if the discharge of the employee "contravened the clear mandate of public policy." *Thompson*, 685 P.2d at 1089.

### III.

■ Upon evaluation of Virginia law and the relevant state and federal cases, the court concludes that the employee at-will doctrine is merely a rebuttable presumption and not a substantive rule of law. In absence of an express provision or specific contract setting a definite period of employment, the presumption of an employee's at-will status may be rebutted by presenting evidence which shows that the parties intended and/or understood that the term of employment was fixed by reference to some articulable standard or procedure. There must be evidence of a custom, practice or policy that governs the employer-employee relationship. Evidence sufficient to establish an implied contract concerning duration of employment effectively rebuts the presumption of at-will status and binds the employer to the terms of such a contract.

### A. IMPLIED UNILATERAL CONTRACT

■ By offering fair treatment pursuant to its warning procedure, AMI impliedly promised to abide by its own policy for disciplining and discharging employees who commit infractions of AMI's conduct policy. AMI has listed specific types of misconduct that are grounds for issuing warnings and types of misconduct which give AMI just cause for immediate dismissal. And AMI has set out the procedures for implementing the warning and dismissal policies. Therefore, AMI has gone beyond merely agreeing not to dismiss without just cause; it made specific promises to its employees not to dismiss without three warnings or just cause. For these reasons, the court finds that the term of employment was not at-will, and, therefore, holds that AMI has fixed the duration of employment according to the procedures articulated in the employee handbook.

■ The court further finds that the facts of the case at bar warrant application of traditional rules of contract analysis. It is apparent that AMI, through its employee handbook, is seeking performance of duties in accordance with its stated goals. To induce the employees to carry out their duties in the manner desired by AMI, AMI has spelled out terms and conditions of employment and promised fair treatment and additional benefits. From the tenor of the language in the employee handbook, AMI has created an implied unilateral contract to govern the working relationship between it and its employees.

The language of the AMI employee handbook, which also incorporates the official AMI conduct code, is clear and unambiguous. It is reasonable to construe an offer from the provisions in the handbook. AMI offers, in addition to salary, continued employment, fair treatment and other benefits to those employees who follow its policies. An employee accepts the terms of the offer by reading the handbook, signifying that he understands the terms and conditions of employment, and is aware of what is ex-

pected from him so that he may benefit from all that AMI is offering. Thompson accepted AMI's offer by doing that and by working according to those terms and conditions. Consideration for AMI's implied promise to follow its own policies was furnished by Thompson's continued work. Thompson was not under any obligation to continue working for AMI, but he did continue-thereby forfeiting his right to quit. Since mutual obligation is not required for there to be a binding and enforceable unilateral contract, Thompson's continued service was sufficient consideration to make the provisions in the employee handbook binding on AMI. AMI through its employee handbook set the tone for the employment relationship. The court finds it difficult to believe that AMI would make false promises of job security and deliberately mislead employees. AMI has created a relationship "instinct with obligation," *Toussaint*, 292 N.W.2d at 892, and it would be patently unfair to allow AMI to offer with one hand what it takes away with the other.[15]

AMI created a sense of job security when it modified the at-will status of its employees. This sense of job security was enhanced by AMI when it distinguished between probationary and permanent employees and when it stated its official policy for firing employees. Employees were essentially instructed that as long as they abided by AMI policy their continued employment was guaranteed. In accordance with *Hercules Powder Co. v. Brookfield*, 189 Va. 531, 540, 53 S.E.2d 804, 808 (1949) and *Dulany Foods, Inc. v. Ayers*, 220 Va. 502, 508–09, 260 S.E.2d 196, 201 (1979), the court finds that the job security provisions in the AMI handbook were more than a mere gratuity, terminable at will; they are contractually binding on AMI.

## B. BREACH OF CONTRACT

Since the court has found that the working relationship between AMI and its employees was governed by an implied unilateral contract, the second issue of whether AMI breached that contract when Thompson was fired is ready to be addressed.

Briefly, the court has determined that: (1) AMI, on its own volition, wrote and distributed an employee handbook in which it spelled out official company policies; (2) "permanent" employment was contingent upon compliance with company policies; (3) employees were made aware of the terms, conditions and policies of their employment; and (4) AMI was contractually obligated to abide by its own policies. The record shows that Thompson had been an excellent employee and had never before been given notice that he had not complied with AMI policies.

The evidence clearly shows that Thompson was wrongfully discharged. AMI has ironically contended that Thompson was fired for violating a provision of its employee conduct policy that gave AMI just cause for immediate dismissal.[16] The policy AMI relies on states that AMI has just cause for immediate dismissal if an employee is disrespectful or discourteous to customers or supervisors.[17] The court finds nothing in the record which shows Thompson acted in such a manner. It appears to the court that Thompson was fired for following company policy regarding his request for proper identification from McColliam. The record is totally lacking in evidence of any disciplinary problems with Thompson.

AMI's act of firing him was clearly unjust and uncalled for in light of the circumstances which precipitated the decision and in light of AMI's promises of fair treatment. AMI simply failed to follow its own

---

**15.** Although the doctrine of promissory estoppel was not raised by Thompson, it could be relied upon as a rationale for enforcing AMI's promises in its employee handbook. AMI should have expected its employees to act or to forebear to act in reliance on those promises.

**16.** The irony of this matter is that AMI first contends it can fire at-will, without reason; yet contends that it fired Thompson according to its policies. Such a capricious stance comports neither with the spirit nor with the plain meaning of the AMI Employee Handbook.

**17.** Employee Conduct Policy, # 6 (Exhibit # 5).

**418**

policies and procedures for firing Thompson. Therefore, the court finds that AMI wrongfully discharged Thompson and thereby breached the provisions of its contract regarding the employee conduct code and the warning procedures. Because AMI was bound by its agreement, it is liable for damages incurred by Thompson as a result of the wrongful discharge.

### IV.

Based on the foregoing discussion, the court holds that the provisions in the AMI Employee Handbook regarding the notice-warning and termination procedures in particular constitute an implied unilateral contract legally binding and enforceable upon AMI. The court further holds that AMI breached its contract when it fired Thompson without just cause and without the required warnings.

An Order will be entered accordingly based upon the above and the record before the court.