John R. SEABOLT, Plaintiff

v.

WESTMORELAND COAL
COMPANY, Defendant.

Ruben L. ALLMAN, Plaintiff,

v.

WESTMORELAND COAL
COMPANY, Defendant.

Allen Ray MORRIS, Hurshell Lee
Johnson, Harold Sargent, John
Ballard Napier, Plaintiffs,

v.

WESTMORELAND COAL
COMPANY, Defendant.

Civ. A. Nos. 87–0342–A, 87–0115–B
and 87–0144–A.

United States District Court,
W.D. Virginia,
Abingdon and Big Stone Gap Divisions.

Jan. 9, 1989.

Charlie Jessee, Abingdon, Va., for Allman.

John McClellan, Kingsport, Tenn., Barry Proctor, Abingdon, Va., for all other plaintiffs.

Thomas Rubenstein, Big Stone Gap, Va., Thomas P. Gies, Jamie Sophir, Washington, D.C., for defendant.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, Senior District Judge.

The plaintiffs are all former employees of Westmoreland Coal Company, the defendant. They were employed at Westmoreland's Holton mine near Big Stone Gap, Virginia, until December of 1986, when they were discharged. They now bring suit for wrongful discharge and defamation of character; in addition, plaintiff Ruben Allman alleges intentional infliction of emotional distress.[1] Westmoreland has moved for summary judgment on all claims. All the plaintiffs are citizens of Virginia. Westmoreland is a Delaware corporation with its home office in Philadelphia, Pennsylvania. This court's jurisdiction is obtained under 28 U.S.C. § 1332.

## I.

Plaintiffs Morris, Johnson, Sargent, and Napier were all section foremen at the Holton mine; Seabolt was assistant general mine foreman in charge of second shift operations. At the time they were hired, they state that they each were given a copy of Westmoreland's Employee Relations Manual, which provides for discharge only for "cause." They contend that this manual constituted a contract between Westmoreland and themselves, and that their discharges were without good cause and therefore a breach of their employment

contract. In addition, plaintiffs maintain that statements made to the press by Westmoreland about their firings were defamatory. For its part, Westmoreland denies that the Employee Relations Manual created an employment contract; states that the company had good cause to fire plaintiffs; and avers that the statements to the press were privileged communications under Virginia law.

In support of the motion for summary judgment, Westmoreland has introduced affidavits and depositions which show that in 1985, the productivity and safety records of the Holton Colliery were both substantially below the industry norms and below the level necessary to succeed in the marketplace. Mine management was replaced in February 1986. The company's vice-president in charge of Virginia operations, Hershiel Hayden, gave the new mine superintendent, Jerry Light (who, along with the new General Mine Foreman, Steve Potter, had previously been successful in turning around another Westmoreland mine), the option of replacing any section foremen who were not up to scratch, since Mr. Hayden believed that poor management of the work force was at the root of the difficulties. Section foremen are the lowest level of supervisory employee. Instead of firing section foremen immediately, Mr. Light, in his affidavit, states that he warned the existing foremen that improvement was required and their jobs were on the line unless the situation was turned around.

Mr. Hayden's affidavit states that despite the company's best efforts to work with the existing section foremen, production continued to be poor, and, in an attempt to pinpoint subpar managers, he and Jerry Light decided to give all the section foreman at Holton performance evaluations. Those who did not receive a score of at least "adequate" would be discharged.

The actual evaluations were conducted by Jerry Light and Steve Potter. The evaluations, according to Michael Cassity, Westmoreland's Personnel Manager, were

---

1. Westmoreland has not moved for summary judgment on the intentional infliction of emo-    tional distress claim.

part of Westmoreland's standard performance appraisal system, which involved arriving at annual "performance plans," then evaluating the employee's actual performance against the plan. Seventy-five (75) percent of the final score is determined by objective factors, viz., "production," (25% of the score) is based on shift-wide production figures, "cost control (25%) comes from mine-wide cost figures, and safety (25%) from the number of violations reportable to the Mine Safety and Health Administration. The remaining 25% is at the discretion of the supervisor, from his opinion of the foreman's mining practices, labor relations, communication abilities, and "completion of section success card goals." Each employee is rated on a scale of 1 to 5, with "1" being "unsatisfactory" and "5" "outstanding." A rating of 2 was considered acceptable for foremen working in continuous miner units, but a 3 was required of those working in the more efficient longwall sections.

The plaintiffs Morris, Sargent, Napier and Johnson were given scores of 2.25, 1.7, 1.875 and 1.98, respectively.[2] As a result, Messrs. Light and Potter discharged them for "poor performance."

The firing of plaintiffs Seabolt and Allman came about in an entirely different manner, namely, the head-on collision of two mine transports under their control. Seabolt, the assistant general mine foreman, had the responsibility of moving the longwall shields (which support the ceiling of the mine during longwall operations) to the face of the seam then being mined. The shields are transported on cars put between two diesel locomotives. Most of the transports which travel inside the mine are electric, and receive power from an overhead wire (catenary) generally referred to as a "trolley wire." Because there are no signals on the line, and to prevent injury if equipment comes into contact with the trolley wire, Federal regulations require that the electric current be switched off when equipment is being moved into the mine. Mr. Seabolt admits in his deposition

that this was his responsibility and he simply forgot to do it. In addition, when the motormen who normally operated the diesel locomotives did not show up for work, he assumed the responsibility for operating the locomotives himself, although he had had only "10 to 15 minutes" training in operating diesel locomotives. Since four men altogether were needed to run the two locomotives, Mr. Seabolt got three miners (who had no experience whatever with diesel locomotives, although they were experienced electric transport motormen) to help him, telling them that he would train them as they went along.

Meanwhile, plaintiff Allman, a section foreman working with a crew inside the mine, had been informed that a longwall move was about to take place. Westmoreland states that its policy requires foremen to keep off the main line during a longwall move, and to communicate with the surface before using the main line if a move is necessary. When the crew Allman was supervising finished its work, Allman decided to move on to his next assignment using the main line, because current was still flowing through the trolley wire and he assumed that if a longwall move was taking place that power would have been cut off. He did not check with anyone on the surface because no phone was convenient.

At the precise moment Allman and his crew were moving to the surface in their electric trolley, Seabolt and his crew, having stalled and restarted several times, were losing control of the diesel locomotives moving the longwall shields into the mine. They jumped off just as the locomotives collided head-on with Allman's trolley. One of the miners on the trolley was killed and others were injured.

Westmoreland thereupon discharged Seabolt and Allman. Since the applicable law is similar, the various plaintiffs' wrongful discharge and defamation claims will be considered together.

---

**2.** Sargent's evaluation score of 2 was below company requirements as he worked in a long-

wall section.

## II.

On a motion for summary judgment, the moving party is entitled to a judgment as a matter of law where the non-moving party has failed to make a sufficient showing of an essential element of his case on which he has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a). *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); see also *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 624, 64 S.Ct. 724, 727, 88 L.Ed. 967 (1944). Rule 50(a) requires the trial judge to direct a verdict if, under controlling law, there can be only one reasonable conclusion as to the verdict. *Brady v. Southern R. Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234–35, 88 L.Ed. 239 (1943). *Cf. Wilkerson v. McCarthy,* 336 U.S. 53, 62, 69 S.Ct. 413, 417, 93 L.Ed. 497 (1949) (where reasonable minds could differ as to the interpretation of evidence, verdict should not be directed). Of course, the standard under Rule 56 requires more than "the mere existence of *some* alleged factual dispute between the parties;" there must be "no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–8, 106 S.Ct. at 2510 (emphasis in original).

## III.

Although, as the defendant points out, the employment-at-will doctrine is "alive and well in Virginia," *Miller v. SEVAMP, Inc.,* 234 Va. 462, 362 S.E.2d 915 (1987), the doctrine is not absolute. *Id.* at 466, 362 S.E.2d at 917. *See also Bowman v. State Bank of Keysville,* 229 Va. 534, 539, 331 S.E.2d 797, 801 (1985). The origin of employment-at-will was the assumption of the common-law judges that if the intended duration of a contract for the rendition of services could not be determined from the terms of the contract, then either party could terminate the contract at any time. *Stonega Coal and Coke Co. v. Louisville & N.R. Co.,* 106 Va. 223, 226, 55 S.E. 551, 552 (1906). If an employee is free to quit his employment at any time, "notions of fundamental fairness" require that the employer be free to discharge him at any time. *Town of Vinton v. City of Roanoke,* 195 Va. 881, 896, 80 S.E.2d 608, 617 (1954).

As this court noted in *Thompson v. American Motor Inns, Inc.,* 623 F.Supp. 409, 416 (W.D.Va.1985), employment-at-will is a rebuttable presumption rather than a substantive rule of law. *Cf. Miller v. SEVAMP, Inc.,* 234 Va. at 466, 362 S.E.2d at 917 ("a pleading seeking to recover damages for the termination of a contract of employment, the terms of which give rise to no fair inference of a specific period for its intended duration, and which is not supported by any substantial additional consideration taking it out of the category of an employment-at-will, is demurrable"). Evidence sufficient to establish an implied contract concerning duration of employment effectively rebuts the presumption of at-will status and binds the employer to the terms of such a contract. *Thompson* at 416. Provisions in an employee handbook providing discharge only for "just cause" or other enumerated reasons are such evidence. *Id.* at 417.

The Westmoreland handbook, called the Employee Relations Manual, under the heading "Discharge" contains the following "Policy Statement:"

It is the philosophy of Westmoreland Coal Company to promote a work environment that fosters a sense of fairness and job security. Westmoreland believes in a practice of progressive discipline. Except in situations where the seriousness of the offense warrants immediate discharge, employees will, through counseling and disciplinary warnings, be made aware of problems and be given ample opportunity to correct such problems.

When discharge becomes necessary, it is further our philosophy that discharge will be only for cause. Discharge for cause includes but is not limited to violations of Company policies, procedures or rules, violations of State or Federal laws or regulations, unsatisfactory job performance, excessive absenteeism, theft

of Company property, and the use of alcohol and/or controlled substances on Company property.

Notwithstanding anything stated herein, management reserves the right to reduce the workforce due to economic necessity.

The Manual continues:

Westmoreland has developed a discipline philosophy effectively taking into account all the factors contributing to behavior or performance which is [sic] clearly not in the best interest of the employee or the organization.

Westmoreland believes that discipline is a positive tool to correct undesired conduct or performance and is applied in a fair and consistent manner on a non-discriminatory basis. Westmoreland further believes that discipline, depending upon the severity of the offense, should be both corrective and progressive in nature. The progressive approach is consistently applied in cases where the offense is not serious enough to warrant immediate discharge (for example, absenteeism, tardiness). It should be clearly understood, however, that certain serious offenses may be cause for immediate discharge (for example, theft, unprovoked assault, dishonesty, falsification of records, using or distributing illegal drugs, purposely damaging or destroying company property). These cited examples are illustrative and not exhaustive.

The first step in the manual calls for a counseling session with at least one private discussion between the employee and "his/her" immediate supervisor in which the company's view of the employee's inadequate performance is to be set forth. "The employee and his/her immediate supervisor identifies [sic] in writing corrective action that [sic] can be taken to abate the problem area(s)," and "agree in writing to meet again in a reasonable amount of time to determine whether such efforts have been successful.... A Performance Improvement Plan may be developed to help employees attain the performance levels identified by the supervisor."

Step Two is a written reprimand which "identifies the offense, corrective action

[sic] and establishes a prescribed time limit for follow-up," and warns the employee that he may be suspended if there is no improvement.

In Step Three, the employee is placed on disciplinary suspension, with the employee on notice that this time he may be discharged if there is no improvement.

Finally, Step Four requires that before an employee is discharged his "immediate supervisor must discuss the case with the appropriate Operations Level Manager.... All decisions to discharge an employee must be reviewed by the Personnel Manager and Vice–President, Virginia Operations before taking final action. Discharge may be effected immediately if the severity of the offense warrants such action."

Clearly emerging from this fog of verbiage is Westmoreland's undertaking to discharge employees only for cause, and then only after taking steps to insure that the employee is well aware of the company's dissatisfaction with his performance, exceptions being made where the employee's infraction was severe, or when the company has to lay people off for economic reasons.

Westmoreland advances two arguments to defeat the application to the Employee Relations Manual's standards to the facts in this case. It says first that the Manual was provided to supervisors as a guide to help them deal with their subordinates, and was not intended to be viewed by employees. Second, it says that even assuming the Manual created an implied in fact contract with the plaintiffs, they were all discharged for just cause in accordance with the provisions in the Manual.

■ The court finds itself in agreement with Westmoreland on the second point as to plaintiffs Seabolt and Allman. The Manual specifically allows immediate discharge for serious offenses, and "violations of State or Federal laws or regulations [or] violations of Company policies, procedures, or rules" are specifically listed as grounds for discharge. In failing to disconnect the trolley power before moving the longwall shields into the mine, Mr. Seabolt, who, it will be remembered, was the assistant gen-

eral mine foreman in charge of second shift operations, violated 30 C.F.R. § 75.1003–2(f) (1987); Mr. Seabolt admitted that he knew about the regulation and simply forgot to "kick" the power. This lapse of memory helped to set in motion the sequence of events which led to the collision with the car carrying Mr. Allman's crew, and the resultant death of a miner. The court agrees that this violation of federal law was serious enough to warrant immediate discharge. Although Mr. Seabolt has claimed, in mitigation of his actions, that the trolley power was "jumped" at the circuit breakers and that therefore even if he had remembered to go through the motions of "kicking" the power the trolley wire would have remained energized, the point is that he is seeking damages because of the company's violation of the Employee Relations Manual, and if that Manual provides specific justification for discharge, as it does here, the court, although sympathetic to Mr. Seabolt's unwillingness to be a scapegoat, has no authority to referee a dispute over the ultimate fairness or unfairness of the company's action. Even assuming that Westmoreland was fastening the blame on the wrong person in firing Mr. Seabolt, his violation of federal regulations means that they did not violate any provisions in the Employee Relations Manual. The courts cannot allow themselves to be used as a forum for second-guessing company personnel decisions.

■ Mr. Allman likewise lays great stress on the failure of others to follow safety rules as being the cause of the accident, but this does not exonerate him from all responsibility.

His failure to check with anyone about the status of the longwall move, after being informed that it was about to take place, was clearly a serious error of judgment, and a violation of company Health and Safety Rule No. 69 which states in part:

It shall be the first duty of each and every foreman to guard the safety of himself and all employees entrusted to his care. Every foreman shall EN-FORCE COMPLIANCE WITH HIS IN-STRUCTIONS, TO THESE RULES, AND THE MINE LAWS. (Emphasis in original).

Although the parties dispute whether or not there was a mine rule that no trolleys should operate during a longwall move without first checking with the surface, the court does not believe that it really matters for purposes of the wrongful discharge count: although the Employee Relations Manual lists violation of state and federal laws as a "cause" for discharge, it also states that the list is "illustrative and not exhaustive." Westmoreland could reasonably have concluded that the poor judgment shown by Mr. Allman was a violation of Rule 69 and a cause for dismissal.

The court therefore concludes that it is appropriate to grant summary judgment to Westmoreland on the wrongful discharge counts brought by Messrs. Seabolt and Allman.

■ However, the situation of the other plaintiffs is different. They were all discharged for poor performance of their duties as section foremen. The Employee Relations Manual contemplates giving employees "ample opportunity to correct such problems," and by its terms sets out a three-step procedure for counseling and discipline before an employee is discharged. In *Thompson v. American Motor Inns,* this court held that where the employer, in its own employee handbook, had made "specific promises to its employees not to dismiss [them] without three warnings or just cause," it had fixed the duration of employment according to the procedures set out in the handbook. 623 F.Supp. at 416. The promises enumerated in Westmoreland's Employee Relations Manual are very similar.

Westmoreland, as noted above, attacks the applicability of the *Thompson* holding to the facts in this case because, they insist, the "Employee Relations Manual" in this case is really a "supervisor's manual," intended solely to guide company officials. There is authority that supervisors' manuals do not create implied contracts of employment. *See, e.g., Lakeside v. Freightliner Corp.,* 612 F.Supp. 10, 12–13 (D.Or.

1984). The distinction apparently made by the courts is that while an employee's manual written for and distributed to employees may create an implied contract, a supervisor's manual is not distributed to employees and therefore cannot be the basis of an implied-in-fact contract.

The matter thus would seem to turn on whether or not the Manual was furnished to plaintiffs, or whether they were covered by its express terms, issues the court cannot determine on the motion for summary judgment. Westmoreland has introduced affidavits from its officials stating that the Manual was not intended for or distributed to plaintiffs, while plaintiffs have submitted affidavits stating that they did receive copies of the Manual and considered from that time on that it created an employment contract. The court discounts the latter claim, but the Manual does state that it is intended to cover "non-bargaining unit employees," a group that includes Morris, Johnson, Sargent, and Napier, who, as section foremen, were in fact supervisory employees, albeit at the lowest level.

The court therefore finds that there is a genuine issue of material fact on the question of whether or not Morris, Johnson, Sargent, and Napier were covered by the Westmoreland Employee Relations Manual. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247, 106 S.Ct. at 2509. Thus the defendant's motion for summary judgment on this issue must be denied.

### IV.

■ The plaintiffs have also brought suit for defamation, based on statements made by Westmoreland about them to the press. Messrs. Seabolt and Allman claim that they were defamed in three articles published in local newspapers about their firings. Relevant excerpts from each follow:

According to Westmoreland spokesman Steve Anderson, Seabolt was terminated for violating federal laws that contributed to the accident; and Allman for violating company policies and procedures.

*Kingsport Times–News,* Dec. 22, 1986.

The rest of the article is a factual account of the accident.

Two men involved in last month's fatal accident at Westmoreland Coal Co.'s Holton Mine near Exeter have been fired, according to a company spokesman.

The two men, Ruben Allman and John Seabolt, both of Big Stone Gap, were fired for their roles in a Nov. 29 accident that killed Jack E. Christian, 54, of Big Stone Gap.

According to a Westmoreland spokesman, Seabolt was fired for violating Federal law, and Allman for violating company policy in the events leading up to the accident.

*Bristol Herald Courier,* Dec. 23, 1986.

This article concludes with a very brief description of the accident.

Westmoreland Coal Co. has dismissed two Holton mine complex employees for apparently violating the company's safety procedures.

Westmoreland Vice President/Virginia Operations Hershiel Hayden said the two men—section foreman Ruben Allman and assistant general mine foreman John Seabolt—were dismissed for violating company rules and regulations.

*The Coalfield Progress,* Norton, Va., Dec. 23, 1986.

Morris, Johnson, Sargent and Napier say that they were defamed by statements appearing in an article in the Big Stone Gap *Post* for December 24, 1987:

... Westmoreland [has] "displaced" eleven employees at its Holton Mine.

Hersh Hayden, WCC Vice President in charge of operations, Virginia Division, said this week, however, that the displacement of the 11 employees are [sic] organizational changes and not an indication of things to come in 1987.

. . . . .

Six of the employees were laid off, effective Dec. 19; three were discharged

effective Dec. 18; and two accepted early retirement.

.    .    .    .    .

Hayden said the discharges were the result of overall Holton mine performance which failed to meet company expectations.

Listed as some of the "performances" that weren't up to par at Holton were safety, coal productivity, cost reduction, and other "standards" that were not met.

"These objectives must be achieved if the company is to keep up with the competition," Hayden said.

The court fails to see anything untrue in any of the above statements, possibly apart from the statement in *The Coalfield Progress* that Mr. Seabolt was discharged for violating company rules and regulations, where in fact the discharge was for violation of federal regulations. Instead, the plaintiffs mainly object to Westmoreland's conclusion that they were guilty of rule infraction or poor performance. Mr. Allman, for instance, stated in his deposition that he believed the articles defamed him because "they stated my name [and] that I violated company rules and regulations [and] I did not, [and] they interfered with me finding, finding a job. Everyone in Wise County or Southwest Virginia knows about it." Mr. Seabolt objects that the articles did not tell the "whole story" about the accident, but admits that what did appear was true. He stated, "Well, it's not false, but it's just their way of covering their hide in my opinion." He was asked:

Q. But all it is, isn't it, is a pure statement of fact that you were dismissed for violating company rules and regulations? Whether or not you agree with the dismissal, that's why you were dismissed, isn't that true?

A. Yes.

The defamation claim of Morris, Johnson, Sargent, and Napier rests on the rather vague article in the *Post* stating that some section foremen were discharged as a "re-sult of overall mine performance which failed to meet company expectations." The article did not mention them by name, and could just as easily be interpreted to mean that the plaintiffs were laid off because of the mine's poor performance rather than their own poor performance. However, even assuming that the article is clearly understood as referring to plaintiffs, and as stating that they were discharged for poor performance, Westmoreland has made a convincing showing, as outlined in Section I of this opinion, that this was in fact the case. The burden is on the plaintiffs to prove falsity. *Gazette v. Harris*, 229 Va. 1, 15, 325 S.E.2d 713, 725 (1985), *cert. den.* 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643 (1985). Although the plaintiffs claim that the evaluations came as a surprise and they were not consulted about them, the evidence is that only 25% of the evaluation score was subjective, and that notification and consultation with plaintiffs would not have changed the results of the evaluations. If the evaluations were "trumped up," as plaintiffs claim, they have provided no evidence beyond their own surmise to prove it. Therefore, even though Westmoreland may have violated the procedures set out in its Employee Relations Manual in discharging Morris, Johnson, Sargent, and Napier, there is no evidence that they were let go for any reason other than poor performance.

Since truth is "an absolute defense [to a charge of defamation] in almost all cases," *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 151, 87 S.Ct. 1975, 1989, 18 L.Ed.2d 1094 (1967) (plurality opinion); *see also Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 489, 95 S.Ct. 1029, 1043, 43 L.Ed.2d 328 (1975); *Pilkenton v. Kingsport Publishing Co.*, 395 F.2d 989, 990 (4th Cir.1968); *Brown v. Shupe*, 629 F.Supp. 760 (E.D.Va. 1985) (Clarke, J.), and none of the plaintiffs has met his burden of showing falsity in any material respect,[3] Westmoreland's motion for summary judgment as to the defamation counts must be granted.

---

**3.** As the Virginia Supreme Court of Appeals pointed out in *Saleeby v. Free Press, Inc.*, 197 Va. 761, 763, 91 S.E.2d 405, 407 (1956): "It is not necessary to prove the literal truth of statements made. Slight inaccuracies of expression are immaterial provided the defamatory charge is true in substance, and it is sufficient to show that the imputation is 'substantially true.'"

## V.

For the reasons stated herein, the defendant's motions for summary judgment on the wrongful discharge claims of Messrs. Seabolt and Allman will be granted; and its motion for summary judgment on the wrongful discharge claims of Messrs. Morris, Johnson, Sargent, and Napier will be denied. The defendant's motions for summary judgment on the defamation counts brought by all plaintiffs will be granted.

An appropriate Order will enter this day.